CHICAGO TITLE AND TRUST COMPANY, Plaintiff-Appellee, *v.* FIRST ARLINGTON NATIONAL BANK *et al.*, Defendants—(Executive Construction, Inc., Defendant and Third-Party Plaintiff-Appellant, *v.* First Arlington National Bank, Defendant and Third-Party Defendant-Appellee; Dennis L. Coates, Defendant-Appellant).

First District (5th Division)   No. 82—1525

Opinion filed September 16, 1983.—Rehearing denied October 17, 1983.

402

Shearer, Blood, Agrella, Boose & Balog, of St. Charles (Richard H. Balog, of counsel), for appellant.

Marshall E. Winokur, of Chicago, for appellee Chicago Title & Trust Co.

Berman, Fagel, Haber, Maragos & Abrams, of Chicago (Joel A. Haber, Alvin D. Meyers, and Kenneth G. Anspach, of counsel), for appellee First Arlington National Bank.

JUSTICE LORENZ delivered the opinion of the court:

Chicago Title and Trust Company (CT&T) filed a complaint against Executive Construction, Inc. (E.C.I.), Dennis L. Coates, John and Nancy Lewis, and First Arlington National Bank (Arlington Bank), as trustee for the Lewises, seeking (1) restitution of an overpayment mistakenly made to E.C.I. from a CT&T escrow account, and (2) damages for a misrepresentation made by E.C.I. and Coates when applying for a disbursement from the escrow.

E.C.I. cross-claimed against the Lewises, and filed a third-party

complaint against Arlington Bank in its individual capacity. (The action against the Bank as trustee was dismissed before trial.)

Following trial by the court, judgment was entered in favor of CT&T, and against E.C.I. and Coates, in the amount of $40,662.90. The court also entered judgment against E.C.I. in its cross-claim and third-party action.

E.C.I. and Coates appeal, raising the following issues:

1. Was the evidence sufficient to find them liable in tort for deceit?

2. Did the trial court err when it denied E.C.I.'s motion for summary judgment?

3. Does section 2 of the Interest Act (Ill. Rev. Stat. 1981, ch. 17, par. 6402) authorize an award of interest against a defendant who has obtained funds by deceit?

4. Did the trial court abuse its discretion by (a) declining to dismiss CT&T's complaint as a sanction for alleged failure to comply with discovery requests, and (b) permitting CT&T to amend its complaint during trial?

5. Is E.C.I. an intended beneficiary of the construction loan agreement between the Lewises and Arlington Bank?

6. Did the trial court abuse its discretion by permitting an architect to give an opinion on the value of construction work completed by E.C.I.?

7. Was it manifestly erroneous to find that E.C.I. was not entitled to judgment against the Lewises on the cross-claim?

We affirm in part and reverse in part. The following evidence is material to our decision.

Arlington Bank agreed to lend $312,000 to the Lewises so that they could build a manufacturing facility in Hoffman Estates, Illinois. E.C.I. was hired as general contractor, and the Lewises, along with Arlington Bank, entered into an escrow agreement with CT&T so that the contractor could obtain progress payments as work was completed on the project.

To receive progress payments under this escrow agreement, E.C.I. was obligated to submit a sworn application detailing the work performed and materials supplied. Once the architect hired by the Lewises certified that the application was correct, Arlington Bank was to furnish CT&T with funds to pay E.C.I.

The first disbursement application was filed on November 4, 1977, and, as requested, E.C.I. received $42,000.20. In its second application, E.C.I. sought a progress payment of $39,459.10. Then, on December 13, 1977, while the second application was pending, CT&T

mistakenly issued a $42,000 check to E.C.I., although Arlington Bank had not supplied funds to cover this payment. Two days later, CT&T paid E.C.I. the $39,459.10 requested in the second application.

E.C.I.'s president, Dennis Coates, testified that although he knew the $42,000 had been issued by mistake, the check was deposited in one of E.C.I.'s accounts without notifying CT&T of its error.

E.C.I. submitted a third application on January 15, 1978, seeking a progress payment of $47,187. In his sworn statement, although Coates claimed that the value of work performed and materials supplied by E.C.I. was $136,478.77, and that the contractor had only received payments of $81,459.30, this statement was incorrect, because it omitted the $42,000 payment which had been issued by mistake.

CT&T's escrow officer testified that she relied upon Coates' representation in the third application in deciding to approve the payment of $47,187 and was unaware of the $42,000 mistaken payment. Therefore, CT&T did not recoup the $42,000 overdraw from the $47,187 sought in the third application.

The Lewises cancelled the construction project in February of 1978, and E.C.I. submitted a fourth and final application on February 15. In it, Coates stated that E.C.I. had supplied services and material costing $169,272, and payments of $127,866.10 and that it was entitled to a final payment of $41,405.90. When Coates testified, he stated that he called John Lewis to explain that E.C.I. had received an unapplied for payment of $42,000, and that E.C.I. would credit this amount toward the balance owed on the terminated contract. (Later, E.C.I. forwarded the excess to Arlington Bank, and the bank sent this money to CT&T.)

On May 19, 1978, CT&T filed a complaint seeking restitution of $40,622.90 from either E.C.I. or the Lewises. The complaint alternatively alleged that either E.C.I. or the Lewises were unjustly enriched by the overdraw in the escrow account, depending upon whether E.C.I. had actually performed the work and supplied the material listed in the fourth application.

E.C.I. cross-claimed against the Lewises, and filed a third-party action against Arlington Bank.

At trial, after Coates testified he knew about the mistakenly issued $42,000 check, CT&T received leave to amend its complaint to add a count against Coates and E.C.I. for tortious misrepresentation. (Coates did not join in E.C.I.'s cross-claim or third-party action, however.)

At the close of the evidence the trial court entered judgment against E.C.I. and Coates in the principle action, and entered judg-

ment against E.C.I. in both its cross-claim and third-party action.
Additional evidence is discussed below where pertinent.

OPINION

I

First we consider whether the evidence was sufficient to justify finding Coates and E.C.I. liable in tort for fraud. The defendants argue that CT&T was not justified in relying on the representation Coates made in the third application because it *knew or should have known* that Coates' statement was false. Also, the defendants contend that Coates did not act with the requisite culpable mental state when he made this representation.

CT&T's escrow officer testified she was unaware of the $42,000 overdraft, and that she approved the third disbursement without recouping the overdraw because she relied on the representation made by Coates concerning the amount of money which E.C.I. had already received from CT&T. As the defendants point out, however, CT&T's auditors became aware of the overdraw within a few days of when the $42,000 check was mistakenly issued, and the defendants conclude CT&T was not deceived because it had imputed knowledge that Coates' representation was false. Furthermore, the defendants contend that the escrow officer's reliance on Coates' representation was not justified because reasonably prudent investigation would have revealed the falsity of the statement.

We start with the fundamental principle that "[t]he recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if,

(a) he relies on the misrepresentation in acting or refraining from action, and

(b) his reliance is justifiable." (Restatement (Second) of Torts sec. 537 (1977); accord, *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599.) The first element of this two-part requirement refers to factual causation: If plaintiff knew that defendant's representation was false, he could not have relied on the misrepresentation, and was not deceived.

To determine whether CT&T had imputed knowledge that the third application contained a misrepresentation, we turn to principles of agency law.

■ "Corporations are artificial legal entities, and the only knowledge which a corporation can be said to have is the knowledge which is imputed to it under principles of agency law. (3 Fletcher, Cyclope-

dia of Corporations sec. 787, at 9 (1975).) Thus, knowledge which a corporate agent receives while acting within the scope of his or her agency is imputed to the corporation if the knowledge concerns a matter within the scope of the agent's authority." *Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 585-86, 434 N.E.2d 511.

■ CT&T therefore had imputed knowledge of what its auditors became aware of. Nevertheless, a tortfeasor does not automatically escape liability for deceit merely because a defrauded corporation had imputed knowledge of the truth. Corporations typically have a large number of employees, and it would not be reasonable to expect each of them to be aware of all the knowledge obtained by every other corporate employee. To blindly preclude recovery for deceit practiced upon a corporate agent merely because a fellow employee knew the truth would make corporations safe marks for fraud. In an action for deceit, therefore, the appropriate focus is on the knowledge of the agent who was deceived, and "[a] person *** who by fraud causes the agent to do what would be a violation of his duty to the principal if the agent knew the facts, is subject to liability to the principal whether the fraud is practiced upon the agent or upon the principal." Restatement (Second) of Agency sec. 315 (1958).

In the present case, CT&T's escrow officer testified that she relied on the misrepresentation made by the defendants in their third application. This was sufficient to satisfy the "actual reliance" requirement even though CT&T had imputed knowledge of the truth through other corporate agents.

■ We next consider whether the escrow officer's reliance was justifiable.

The attitude of courts toward the question of justifiable reliance has almost completely changed in the last 50 years (Prosser, Torts sec. 108, at 717 (4th ed. 1971)), and Illinois has two opposing lines of authority on this question. As in other jurisdictions, "[e]arlier decisions, under the influence of the prevalent doctrine of 'caveat emptor' laid great stress upon the plaintiff's 'duty' to protect himself and distrust his antagonist, and held that he was not entitled to rely even upon positive assertions of fact made by one with whom he was dealing at arm's length. It was assumed that any one may be expected to overreach another in a bargain if he can, and that only a fool will expect common honesty. Therefore the plaintiff must make a reasonable investigation, and form his own judgment." Prosser, Torts sec. 108, at 717 (4th ed. 1971).

This older approach is typified by *Schmidt v. Landfield* (1960), 20

Ill. 2d 89, 169 N.E.2d 229, where the court stated:

"The rule is well established that a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is afforded the opportunity of knowing the truth of the representations he is chargeable with knowledge; and if he does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by misrepresentations." 20 Ill. 2d 89, 94. See also *Morel v. Masalski* (1928), 333 Ill. 41, 46, 164 N.E. 205; *Dillman v. Nadlehoffer* (1886), 119 Ill. 567, 577, 7 N.E. 88.

The other line of Illinois authority, which Dean Prosser cites as among "[t]he better reasoned cases" (Prosser, Torts sec. 108, at 716 (4th ed. 1971)), rejects the notion that plaintiff's negligence in failing to discover intentional fraud will bar his action for deceit. This line of authority accordingly holds that "[t]he law does not require that neither shall believe the statements of the other. If one party makes a positive statement of a material fact as true which he knows to be false but intends to be relied upon by the other party as true, and the statement actually is relied and acted upon as true by the other party, the party making the statement cannot charge the other with negligence in believing it." *Eisenberg v. Goldstein* (1963), 29 Ill. 2d 617, 621, 195 N.E.2d 184, *cert. denied* (1964), 377 U.S. 964, 12 L. Ed. 2d 735, 84 S. Ct. 1645.

Despite *Schmidt v. Landfield*, the rule enunciated two years later by the supreme court in *Eisenberg v. Goldstein* is not a recent development in Illinois law, and as far back as 1863 the supreme court stated, in *Linington v. Strong* (1883), 107 Ill. 295, 302, that under "well settled" authority,

"[A] party guilty of fraudulent conduct shall not be allowed to cry 'negligence,' as against his own deliberate fraud. Even where parties are dealing at arms' length, if one of them makes to the other a positive statement, upon which the other acts (with the knowledge of the party making such statement) in confidence of its truth, and such statement is *known to be false* by the party making it, such conduct is fraudulent, and from it the party guilty of fraud can take no benefit. While the law does require of all parties the exercise of reasonable prudence in the business of life, and does not permit one to rest indifferent in reliance upon the interested representations of an adverse party, still, as before suggested, there is a certain limitation to this rule, and, as between the original parties to the

transaction, we consider that where it appears that one party has been guilty of an intentional and deliberate fraud, by which, to his knowledge, the other party has been misled, or influenced in his action, he can not escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care." 107 Ill. 295, 302-03. Accord, *Roda v. Berko* (1948), 401 Ill. 335, 342, 81 N.E.2d 912; *Leonard v. Springer* (1902), 197 Ill. 532, 539, 64 N.E. 299; Restatement (Second) of Torts secs. 540, 545A (1977).

This, of course, does not obviate the requirement that plaintiff's reliance must be justifiable, and there is a recurring tension between the approaches typified by *Linington* and *Schmidt* as courts determine, on a case-by-case basis, whether a particular plaintiff was justified in relying on a particular misrepresentation. When a court finds, for example, that reliance was not justifiable, it can cite to *Schmidt*. (See, *e.g., Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599.) Conversely, if the court decides that reliance was justifiable, it can rely on *Linington*. See, *e.g., Eisenberg v. Goldstein* (1963), 29 Ill. 2d 617, 621, 195 N.E.2d 184, *cert. denied* (1964), 377 U.S. 964, 12 L. Ed. 2d 735, 84 S. Ct. 1645.

As a practical matter courts apply elements of both lines of authority, and all the relevant circumstances of the particular case must be considered in determining whether plaintiff's reliance was justifiable. In short, the "reliance must be found to be reasonable under the circumstances. The plaintiff's conduct must not be so unreasonable, in light of the information open to him, that the law may properly say that this loss is his own responsibility." (Prosser, Torts sec. 108, at 715 (4th ed. 1971).) It is therefore recognized that "[a]lthough the plaintiff's reliance on the misrepresentation must be justifiable *** this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. Negligent reliance and action sometimes will not be justifiable, and recovery will be barred accordingly; but this is not always the case." Restatement (Second) of Torts sec. 545A, comment *b* (1977).

As Dean Prosser explained, "It is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that

he is required to make an investigation of his own." Prosser, Torts sec. 108, at 718 (4th ed. 1971).

■ Applying these principles to the present case, the initial inquiry is whether the evidence was sufficient to support finding that Coates intended to deceive plaintiff's escrow officer when he submitted E.C.I.'s third disbursement application. The defendants argue that there was no direct evidence of intent to deceive, and they assert that the misrepresentation was innocently made. However, "Fraud, like all other facts, may be proved by circumstances. We seldom expect to prove it by the admissions of a party and rarely to find direct and positive evidence of the fact. 'Whatever circumstances, when proven, convince the mind that the fraud charged has been perpetrated, is all that is required.' " *Schwarz v. Reznick* (1913), 257 Ill. 479, 485, 100 N.E. 900, quoting *Bryant v. Simoneau* (1869), 51 Ill. 324, 327.

Moreover, the trial court's findings of fact will not be disregarded unless they are against the manifest weight of the evidence. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624.) On appeal the court must take questions of testimonial credibility as resolved in favor of the prevailing party, and must draw from the evidence all reasonable inferences in support of the judgment. (*Blue v. St. Clair Country Club* (1955), 7 Ill. 2d 359, 363, 131 N.E.2d 31.) Thus, a judgment is not against the manifest weight of the evidence merely because "there is sufficient evidence to support a contrary judgment." *People ex rel. Lauth v. Wilmington Coal Co.* (1949), 402 Ill. 161, 167, 83 N.E.2d 741.

This deferential attitude toward the trial court's findings of fact is based upon the realization that a factfinder which observes witnesses testify has a superior ability to assess their believability than a reviewing court which is limited to reading a lifeless transcript. *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624.

Taking the evidence in the present case in the light most favorable to the appellee, and giving proper deference to the trial court's evaluation of the credibility of the witnesses, we conclude it is not manifestly wrong to decide that Coates intended to deceive plaintiff's escrow officer. It may be that Coates expected CT&T would recoup its overdraw from the Lewises, and that he did not intend to cause pecuniary damage to CT&T, but the relevant question is whether there was intent to induce reliance on the misrepresentation, and it is not necessary to prove intent to cause pecuniary loss in order to recover for deceit. *Case v. Ayers* (1872), 65 Ill. 142.

The third disbursement application appeared regular on its face, and plaintiff's escrow officer did not have notice of suspicious circum-

stances which would have triggered a duty to investigate further. Under the circumstances of this case it was not against the manifest weight of the evidence to find that plaintiff's employee acted reasonably and was thereby justified in relying upon the misrepresentation.

■ We briefly note the additional argument that the doctrine of *laches* precludes plaintiff's action. *Laches* is not applicable to actions at law, however, and "[i]t is frequently held that where a legal right is involved, and, upon ground of equity jurisdiction, the courts have been called upon to sustain the legal right, the mere laches of a party, unaccompanied by circumstances amounting to an estoppel, constitutes no defense." 2 Pomeroy on Equity Jurisprudence sec. 419(e), at 180 (5th ed. 1941). See, *e.g.*, *Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 552, 147 N.E.2d 341 ("*Laches* *** operate[s] to bar relief in equity").

The defendants do not argue that the doctrine of estoppel is applicable to the facts of the present case, and the doctrine of *laches* is not a defense to plaintiff's tort action.

## II

■ The second issue is whether a litigant can appeal from an order denying a motion for summary judgment in cases where the movant subsequently lost in a trial on the merits. The trial court denied E.C.I.'s motion for summary judgment, and the corporation argues that this was reversible error. Analytically this is an unusual question because (1) plaintiff presented sufficient evidence to prevail after trial on the merits, but (2) defendant contends the judgment should be reversed because plaintiff failed to show *before trial* that it would be able to produce the evidence it eventually presented. See *Home Indemnity Co. v. Reynolds & Co.* (1962), 38 Ill. App. 2d 358, 366, 187 N.E.2d 274.

As the court pointed out in *Home Indemnity*, if the trial court erroneously denied a motion for summary judgment, it would be unjust to hold that this decision is never reviewable. However, if the party opposing the motion prevailed after trial on the merits, it would also be unjust to set aside the judgment merely because the opponent was able to produce more evidence at trial than it adduced during pretrial proceedings. 38 Ill. App. 2d 358, 366.

Balancing these competing interests, the court concluded that "[t]he greater injustice would be to the party which would be deprived of the jury verdict. Otherwise, a decision based on less evidence would prevail over a verdict reached on more evidence and judgment would be taken away from the victor and given to the loser despite the victor having the greater weight of the evidence. This would defeat the

fundamental purpose of judicial inquiry." (38 Ill. App. 2d 358, 366.) Accordingly the court held that if a motion for summary judgment is improperly denied, the error must be considered harmless in light of the subsequent trial. (38 Ill. App. 2d 358, 367. See also Annot., 15 A.L.R.3d 899, 902 (1967).) We therefore hold that even if the trial court erred when it denied E.C.I.'s motion for summary judgment, the error is harmless in light of the subsequent trial.

## III

■ Next, the defendants argue it was improper to award plaintiff prejudgment interest under section 2 of the Interest Act. (Ill. Rev. Stat. 1981, ch. 17, par. 6402.) The pertinent portion of section 2 authorizes prejudgment interest when there has been "an unreasonable and vexatious delay of payment" by a debtor, and this portion of section 2 has been interpreted as providing that "where property has been wrongfully taken, or converted into money, and an action of trespass or trover may be maintained, interest may properly be recovered." (*Illinois Central R.R. Co. v. Cobb, Blaisdell & Co.* (1874), 72 Ill. 148, 153. Accord, *Geohegan v. Union Elevated R.R. Co.* (1915), 266 Ill. 482, 492-93, 107 N.E. 786.) The supreme court explained that under this portion of section 2, "[t]here can be no difference between the delay of payment of a moneyed demand and one where property has been wrongfully taken, or taken and converted into money or its equivalent—the two rest upon the same principle." 72 Ill. 148, 153. Compare *Toledo, Peoria & Warsaw Ry. Co. v. Johnston* (1874), 74 Ill. 83 (holding that interest could not be recovered under section 2 where plaintiff was deprived of his property by misconduct which was merely negligent).

Employing the rationale of *Cobb* in the present case, there can be no difference, under section 2 of the Interest Act, between a situation in which repayment of a contract debt has been unreasonably and vexatiously delayed and an action to recover funds which were obtained by tortious misrepresentation—"the two rest upon the same principle" (72 Ill. 148, 153.) Thus, plaintiff was entitled to interest under section 2 of the Interest Act.

## IV

■ The defendants further argue that the trial court abused its discretion by (a) denying their motion to dismiss the complaint as a sanction for failure to comply with supreme court discovery rules, and (b) permitting plaintiff to amend its complaint during trial.

We disagree.

Just before trial commended, E.C.I. moved to dismiss the complaint on the grounds that plaintiff failed to respond to its interrogatories and requests for discovery of documents. (See 87 Ill. 2d Rules 213, 214.) Plaintiff insisted, however, that it had complied with all requests for discovery, and the trial court denied the motion as untimely. We find that the defendants have failed to establish that the trial court abused its discretion.

An appellant has the burden of establishing that the trial court erred (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 241, 242 N.E.2d 237), and it is presumed that the trial court has not abused its discretion (*Anthony v. Gilbrath* (1947), 396 Ill. 125, 127, 71 N.E.2d 84). Moreover, "Upon appeal, every reasonable intendment not negatived by the record will be indulged in support of the judgment." *Union Drainage District No. 5 v. Hamilton* (1945), 390 Ill. 487, 493, 61 N.E.2d 343.

We cannot conclude that the trial court abused its discretion in the present case, because E.C.I. never established that there was a failure to comply with its discovery requests. The record contains nothing more than an unsupported and unverified allegation of noncompliance—an allegation which plaintiff denied. In the absence of countervailing evidence, it must be presumed that plaintiff complied with E.C.I.'s discovery requests.

■ Additionally, the defendants argue the trial court abused its discretion when it permitted plaintiff to amend its complaint during trial by adding a count for deceit. This was an abuse of discretion, according to the defendants, because they were not given an opportunity to file a jury demand, and they were not given sufficient time to prepare a defense to the amended complaint.

We find no merit in these arguments. First of all, the trial court never denied the defendants an opportunity to file a jury demand. Instead, the defendants never indicated a desire to have a jury decide the tort action. Their appellate argument on this point appears to be nothing more than a post-trial afterthought. Furthermore, the complaint was amended on March 27, 1981, and the trial did not resume until January 19, 1982—almost 10 months later. However, the defendants fail to explain why a 10-month continuance was not an adequate amount of time in which to prepare a defense. Nor do they explain how an additional continuance would have aided them.

The trial court has broad discretion in ruling on motions to amend pleadings during trial, and its ruling will not be reversed unless there has been a manifest abuse of discretion. (*Mundt v. Ragnar Benson, Inc.* (1975), 61 Ill. 2d 151, 161, 335 N.E.2d 10.) Moreover, the trial

court's ruling on a motion to amend pleadings during trial does not constitute an abuse of discretion if it furthers the ends of justice. *Deasey v. City of Chicago* (1952), 412 Ill. 151, 157, 105 N.E.2d 727.

Again we find that the defendants have failed to rebut the presumption that the trial court did not abuse its discretion. To the contrary, it is apparent that allowing the amendment furthered the goal of justice by permitting a defrauded plaintiff to recover damages.

We briefly note that in their argument concerning the propriety of granting leave to amend, the defendants assert that plaintiff's action at law for deceit should have been dismissed "for want of equity"; apparently because this case was tried in the chancery division of the circuit court. However, when (as in this case) there has been no demand for jury trial, Supreme Court Rule 232 authorizes the court to try an equitable action together with an action at law. (See 87 Ill. 2d R. 232.) We consequently find no merit in the argument that the action at law for deceit should have been dismissed "for want of equity."

## V

■■■ E.C.I. additionally asserts the trial court erred by entering judgment against the firm in its third-party action against Arlington Bank. According to E.C.I., it is entitled to recovery against Arlington Bank for breach of the loan agreement which the bank entered into with the Lewises. The underlying premise in this argument is that E.C.I. was an intended, direct beneficiary of the loan agreement.

"The rule is settled in this State that if a contract be entered into for [the] direct benefit of a third person, not a party thereto, such a third person may sue for a breach thereof. The test is whether the benefit to the third person is direct to him or is but an incidental benefit arising from the contract. If direct, he may sue on the contract; if incidental, he has no right of recovery thereon." *Cherry v. Aetna Casualty & Surety Co.* (1939), 372 Ill. 534, 542, 25 N.E.2d 11. Accord, *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.* (1980), 78 Ill. 2d 381, 384, 400 N.E.2d 918.

We have carefully examined the loan agreement between Arlington Bank and the Lewises, and we find nothing to indicate that E.C.I. was anything more than an incidental beneficiary of this contract. More importantly, E.C.I. has not referred us to any evidence in the record which would establish that Arlington Bank breached its agreement with the Lewises. In short, we find no merit in E.C.I.'s arguments on this issue, and the trial court properly entered judgment in favor of the bank in the third-party action.

## VI

■■■ The next issue is whether the trial court abused its discretion by permitting an architect to give his opinion on the value of construction work which he had been hired to supervise.

"A witness is competent to testify as to the value of real property if it appears that he has some peculiar means of forming an intelligent and correct judgment as to the value of the land in question beyond what is presumed to be possessed by men generally." *Department of Public Works & Buildings v. Oberlaender* (1969), 42 Ill. 2d 410, 414, 247 N.E.2d 888.

"[T]he value of land is a question of fact to be proved the same as any other fact, and any person acquainted with it may testify as to its value. It is not necessary that a witness be an expert, or be engaged in the business of buying and selling the kind of property under investigation." *Department of Public Works & Buildings v. Bohne* (1953), 415 Ill. 253, 264, 113 N.E.2d 319.

The witness in question, Warren Kostak, was an architect hired by the Lewises to supervise construction of their building and certify whether E.C.I. actually performed the work for which it sought payment. Kostak therefore had substantial personal knowledge concerning the value of the improvements made to the property. This knowledge, plus his training as an architect, gave him a sufficient basis for "forming an intelligent and correct judgment as to the value of the land in question beyond what is presumed to be possessed by men generally." (*Department of Public Works & Buildings v. Oberlaender* (1969), 42 Ill. 24 410, 414.) We therefore find that it was not an abuse of discretion to permit Kostak to give an opinion on the value of the work performed by E.C.I.

## VII

■■■ Last, we consider whether the trial court erred by entering judgment against E.C.I. in its cross-claim against the Lewises.

As noted above in section I, it was not manifestly erroneous to find that CT&T suffered pecuniary loss because of an intentional misrepresentation concerning the amount of funds it had disbursed from its escrow account. Nevertheless, this does not mean that E.C.I. did not perform all the work which it claimed, nor that it was not entitled to payment for this work under its construction contract with the Lewises. The Lewises (through the Arlington Bank) apparently paid $127,866.10 for E.C.I.'s work. Therefore, if as E.C.I. claims, it actually performed work and supplied material worth $69,272 before the

project was cancelled, E.C.I. must either be permitted to keep the balance of the mistaken payment, or it must be permitted recovery on the contract. To hold otherwise would unjustly enrich the Lewises.

The Lewises have not filed an appellees' brief, but we have carefully scrutinized the pertinent evidence. The record shows that the architect hired by the Lewises certified that, as of January 24, 1978, E.C.I. had performed $136,478.77 worth of construction work. E.C.I. continued working on the project until it was cancelled in mid-February, and the contractor then submitted a final disbursement application, along with lien waivers from its subcontractors.

These lien waivers established that E.C.I. completed $41,405.90 worth of work on the project between mid-January (when the third application was filed) and mid-February. Taking the value of the work established by this documentary evidence, and adding the value of the work certified by the supervising architect as completed as of the date of the third application, E.C.I. concludes that it proved it performed a total of $169,272 worth of work on the project.

Furthermore, Warren Kostak, the architect hired by the Lewises testified that the work listed in E.C.I.'s fourth application was in fact completed, and that E.C.I. charged reasonable amounts for this work in its final application.

We find the overwhelming, manifest weight of the evidence established that E.C.I. performed approximately $169,272 worth of work on the project before it was cancelled, but that the firm only received about $127,866.10 from the Lewises. Moreover, the Lewises are not entitled to have CT&T's mistaken payment applied toward their contract liability, and they are therefore liable to E.C.I. on the construction contract. We accordingly reverse the portion of the trial court's order which entered judgment against E.C.I. on its cross-claim against the Lewises. On remand the trial court must determine the amount of E.C.I.'s contract damages.

Based on the reasons given above, the judgment of the circuit court is affirmed in part, reversed in part, and remanded with directions.

Affirmed in part, reversed in part, and remanded with directions.

WILSON, P.J., and SULLIVAN, J., concur.