GENERAL ELECTRIC COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Diana Campbell, Appellee).

Fourth District (Industrial Commission Division)   No. 4—85—0485WC

Opinion filed June 12, 1986.—Rehearing denied August 1, 1986.

Henry D. Noetzel & Associates, Ltd., of Peoria, for appellant.

Ralph Schroeder, of Livingston, Barger, Brandt & Schroeder, of Bloomington, for appellee.

JUSTICE KASSERMAN delivered the opinion of the court:

Claimant, Diana Campbell, filed an application for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*) for wrist injuries suffered while she was employed by General Electric Company in Bloomington. An arbitrator awarded claimant temporary total incapacity benefits under section

8(b)(1) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(b)(1)) and permanent partial disability benefits under section 8(d)(2) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(d)(2)) based upon a finding that the wrist injuries sustained caused a 25% disability of claimant.

Following a hearing on review, the Industrial Commission increased the amount of temporary total incapacity benefits awarded to claimant and awarded wage-differential benefits under section 8(d)(1) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(d)(1)) based upon a finding that claimant was permanently incapacitated from pursuing her usual and customary line of employment. The circuit court of McLean County confirmed the Industrial Commission's decision, and General Electric has appealed to this court.

General Electric maintains on appeal that the Commission erred in awarding claimant permanent partial disability benefits based on earnings loss under section 8(d)(1). Alternatively, General Electric argues that the Commission erred in calculating the amount of such benefits. We affirm.

Claimant testified at the hearing before the arbitrator as follows. Claimant, who was 23 years of age, was working for General Electric during December 1978, as she had since March 17, 1977. She had performed various job-related duties during her employment with General Electric. In December 1978, her employment duties as an accumulator required her to collect certain parts including power supplies, fuse boxes, transformers and brackets, which were used by other employees in the construction of particular General Electric products. Her duties as an accumulator also required her to load and unload certain materials. Each of the duties which she had performed during her employment with General Electric, including her duties as an accumulator, required claimant to use both of her hands.

While performing her employment duties on December 6, 1978, claimant climbed into the back of a tractor-trailer in order to obtain a particular copper bracket which was needed by a fellow employee. As she was attempting to climb down from the back of the trailer, she slipped on a patch of ice, fell a distance of approximately 3 to 4 feet to the ground, and landed on her right hand. Claimant related that at this point she experienced great pain, reported the injury to her foreman and sought medical attention from the company physician, Dr. Price. Although the physician was not in his office at that time, the company nurse took X rays of claimant's right wrist and instructed claimant to return for treatment the following day.

The company physician subsequently examined claimant, determined that she had sprained her wrist, informed her that this injury

would eventually heal and recommended that she soak her wrist each day. Although she followed the company physician's advice and continued to work until the latter part of March 1979, claimant was still in pain and her wrist continued to swell. The company physician then suggested that she seek medical attention from Dr. Jerald Bratberg, an orthopedic surgeon.

Following his examination of claimant on or about March 28, 1979, Dr. Bratberg recommended that claimant cease working due to the condition of her right wrist. In a May 22, 1979, report which was introduced at the hearing, Dr. Bratberg stated that X rays which were taken in his office indicated that claimant had "early changes of avascular necrosis of the carpal lunate bone" which he believed was "post-traumatic." This report also indicated that claimant continued to experience pain and tenderness in her wrist and that there was a loss of full extension and full flexion of her wrist.

In an October 9, 1979, report which was introduced into evidence, Dr. Bratberg stated that if claimant's condition did not improve within three months from that date, he would recommend that claimant have arthroplasty of her right wrist with silastic implant replacement of the lunate bone.

Medical records introduced at the hearing indicate that: (1) claimant began receiving medical treatment from Dr. Alain Menguy in November 1979, and (2) Dr. Menguy performed surgery on claimant at Carle Clinic in Urbana on January 21, 1980, in order to implant a replacement of the lunate bone in her wrist.

Claimant testified that she wore various casts on her wrist for a period of approximately 11 weeks after the surgery. On May 6, 1980, claimant returned to work at General Electric and was assigned to work on a punch press and sorting machine. At the conclusion of her shift, claimant's wrist was swollen and painful. The company nurse examined claimant's wrist on two occasions and informed claimant that the condition of her wrist would not allow her to perform her employment duties. Claimant testified that General Electric then "put [her] on layoff again."

Claimant did not work again until the early portion of 1981. At that time, she returned to work at General Electric and continued to work for a period of approximately nine months. She was given various tasks which were designated as "light duty" work. For example, claimant was initially assigned the task of sorting screws which required claimant to use her right hand to press certain buttons on a machine. While performing this task, claimant experienced pain in her right wrist. In addition, claimant was forced to operate the machine

with her right elbow because she was unable to press the buttons with her right hand.

Claimant testified that the tasks to which she was assigned during this approximately nine-month period were "created jobs" and "varied from day to day." During the latter portion of this period, claimant was being "bumped" from position to position as employees with more seniority with General Electric took the job upon which claimant was working and forced her to move to another job. Finally, claimant was assigned the task of wrapping coils. However, claimant testified that she did not perform this task since it required the use of both of her hands. At the end of this period, claimant stopped working for General Electric and once again started receiving temporary total incapacity benefits. Claimant testified at the hearing that she had not worked for General Electric since the end of this nine-month period.

Claimant further testified at the hearing that: (1) the flexibility of her wrist was limited, (2) she experienced severe pain in her wrist on the frequent occasions when the wrist would swell, and (3) she occasionally experienced numbness in her index and ring finger on her right hand.

In a February 6, 1982, report which was introduced into evidence, Dr. Gordon Schultz, who had examined claimant, stated that claimant had "reached maximum recovery which leaves her with considerable disability in the wrist." Dr. Schultz also stated that although she could do light work with her hands, her permanent disability prevented her from doing "medium work" or "heavy work."

Following the hearing, the arbitrator awarded claimant 165⁵/₇ weeks of temporary total incapacity benefits at the rate of $155.20 per week under section 8(b)(1) of the Act and ordered General Electric to pay certain penalties under section 19(1) of the Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.19(1)). The arbitrator also determined that the wrist injuries sustained caused a 25% disability of claimant and awarded 125 weeks of permanent partial disability benefits at the rate of $155.20 per week under section 8(d)(2) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(d)(2).

During the hearing on review before a member of the Commission, claimant testified as follows. On May 6, 1983, she obtained employment as a waitress in a restaurant known as The Hornet's Nest. Although she carried trays of food and dishes with her left hand and seldom used her right hand, she often experienced pain in her right wrist at the conclusion of her work shift. Claimant also introduced evidence which established the rate of pay for the General Electric job which she performed prior to her injury and her earnings as a wait-

ress at the time of the hearing.

The Commission found that claimant had been temporarily totally disabled for an additional period of 12$\frac{1}{7}$ weeks subsequent to the date of the arbitration hearing. Accordingly, the Commission awarded claimant 177$\frac{6}{7}$ weeks of temporary total incapacity benefits at the rate of $155.20 per week under section 8(b)(1) of the Act.

The Commission also determined that: (1) claimant was permanently incapacitated from pursuing her usual and customary line of employment, and (2) she was entitled to receive compensation under section 8(d)(1) of the Act for the duration of her disability in an amount equal to 66$\frac{2}{3}$% of the difference between the average amount that she would be able to earn in the full performance of her duties in the occupation in which she was engaged at the time of her accident and the average amount that she was earning at the time of the hearing before the Commission. (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(d)(1).) Accordingly, the Commission awarded claimant earnings-loss benefits in the amount of $174.91 per week. The Commission also ordered General Electric to pay claimant interest under section 19(n) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.19(n)).

The circuit court of McLean County confirmed the decision of the Commission on appeal, and General Electric has perfected the instant appeal to this court.

General Electric argues on appeal that the Industrial Commission's decision to award permanent partial disability benefits to claimant was contrary to the manifest weight of the evidence. General Electric notes that after the December 1978 accident, claimant returned to work at General Electric in early 1981 and continued to work for approximately nine months. Throughout this period, claimant was "bumped" as employees with greater seniority took the job upon which claimant had been working and forced her to move to lower job classifications. General Electric argues that at the end of this nine-month period, claimant was laid off due to lack of work. In addition, General Electric introduced evidence that the employee with the least seniority at the Bloomington plant at the time of the hearing before the arbitrator started working on June 10, 1976, while claimant started working at that plant on March 17, 1977. Accordingly, General Electric argues that claimant's employment was terminated due to lack of work, rather than her physical disability.

In support of this argument, General Electric relies on the case *Lauhoff Grain Co. v. Industrial Com.* (1984), 125 Ill. App. 3d 410, 465 N.E.2d 972. There, claimant was hired to unload and stack 100-pound sacks of grain. On the sixth day of her employment, claimant

reached up to adjust the position of one of the stacked bags and injured her back. Claimant's doctor released her to return to work without restrictions on October 15, 1979. However, the claimant was terminated by Lauhoff when she reported to work that day. Claimant testified that she had not worked since that date and continued to seek treatment from a chiropractor for the pain which she experienced. (125 Ill. App. 3d 410, 411-12, 465 N.E.2d 972, 973.) The Commission awarded permanent partial disability benefits to claimant; however, the circuit court set aside the Commission's finding of permanent partial disability. In affirming the judgment of the circuit court, this court in *Lauhoff Grain* determined that the Commission's decision to award permanent partial disability to claimant was contrary to the manifest weight of the evidence.

■ We note that the *Lauhoff Grain* case may be distinguished from the case at bar. There, the court found that Lauhoff Grain had properly terminated claimant's employment based upon her inability to perform her job prior to the injury. No showing was made in this case that claimant was unable to perform her job prior to her injury.

In addition, the *Lauhoff Grain* court noted that the medical evidence that was introduced indicated that claimant suffered no permanent disability. Here, claimant testified that the flexibility of her wrist was limited and that she continued to experience severe pain in her wrist. Moreover, the medical report of Dr. Gordon Schultz, who had examined claimant, indicates that she had "considerable" permanent disability in her wrist and that such disability prevented her from doing "medium work" or "heavy work." Accordingly, we conclude that the record in the case at bar contains sufficient evidence to support the Industrial Commission's finding that claimant was permanently partially disabled.

Moreover, after reviewing the record, we reject General Electric's contention that claimant's employment was terminated due to lack of work rather than her physical disability. The record indicates that during the nine-month period when claimant returned to work she experienced pain in her right wrist even though the various "created jobs" which she performed were all "light duty" work. Claimant testified that she was finally assigned the task of wrapping coils, but she did not perform this task since it required the use of both of her hands. At the end of this period, claimant stopped work and immediately began receiving temporary total incapacity benefits.

In addition, shortly after the conclusion of this nine-month period, General Electric engaged International Rehabilitation Associates, Inc. (International), to provide rehabilitation services to claimant. A copy

of an explanatory brochure, which was sent by International to claimant's attorney, was introduced into evidence. This brochure indicates that International's goal is to "help the disabled client return to maximum potential" and describes the "benefits [of rehabilitative services] to the disabled client."

Based on the foregoing evidence, the Commission properly could have concluded that claimant's employment was terminated due to the physical disability she sustained as a result of the December 1978 accident, rather than due to lack of work.

General Electric also asserts that the Commission erred in awarding benefits based on earnings loss under section 8(d)(1) rather than awarding benefits based on permanent partial disability of a person as a whole under section 8(d)(2).

We need not address this argument as General Electric has failed to cite any supporting authorities and the argument presented is little more than bare assertions of the issues sought to be raised. *Deckard v. Joiner* (1970), 44 Ill. 2d 412, 419, 255 N.E.2d 900, 904.

In any event, we note that the supreme court has recently discussed the propriety of section 8(d)(1) earnings-loss awards. (*General Electric Co. v. Industrial Com.* (1982), 89 Ill. 2d 432, 433 N.E.2d 671.) There, the arbitrator awarded compensation to claimant for 20% loss of use of a hand pursuant to a schedule of benefits set forth in section 8(e) (Ill. Rev. Stat. 1975, ch. 48, par. 138.8(e)). The Commission granted a wage-differential award under section 8(d)(1). On review, General Electric argued that such an award was improper and that claimant instead should have received a scheduled award under section 8(e).

The court in *General Electric* stated:

> "Scheduled awards are often not fair. *** Nor are scheduled allowances always fast and certain. It is often easier to calculate how much a claimant's earnings have decreased since the accident than to assign a percentage partial loss of use. *** If ***
> [a claimant] can prove an actual loss of earnings greater than the schedule presumes, there is no reason why [a claimant] should not recover that loss. In theory, the basis of the workers' compensation system should be earnings loss, not the schedule." (*General Electric Co. v. Industrial Com.* (1982), 89 Ill. 2d 432, 437-38, 433 N.E.2d 671, 673-74.)

As a result, the court concluded that the Commission's decision to award compensation for earnings loss under section 8(d)(1) was proper.

Section 8(d)(1) provides:

"If, after the accidental injury has been sustained, the employee as a result thereof becomes partially incapacitated from pursuing his usual and customary line of employment, he shall, except in cases compensated under the specific schedule set forth in paragraph (e) of this Section, receive compensation for the duration of his disability, subject to the limitations as to maximum amounts fixed in paragraph (b) of this Section, equal to 66⅔% of the difference between the average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident." Ill. Rev. Stat. 1983, ch. 48, par. 138.8(d)(1).

■ In the instant case, claimant introduced evidence indicating that: (1) she sustained a work-related accidental wrist injury in December 1978, and (2) she became permanently partially incapacitated from pursuing her usual and customary line of employment as a result of the 1978 injury. Claimant also introduced evidence concerning the earnings loss caused by this injury. We also note that claimant did not receive a compensation award under the specific schedule set forth in section 8(e). (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(e).) The supreme court has recently determined that compensation under section 8(d)(1) is barred only if compensation is actually awarded under section 8(e). (*General Electric Co. v. Industrial Com.* (1982), 89 Ill. 2d 432, 437, 433 N.E.2d 671, 673.) Accordingly, we conclude that the Industrial Commission did not abuse its discretion in awarding compensation for loss of earnings under section 8(d)(1).

Alternatively, General Electric urges that even if an earnings-loss award were proper, the Industrial Commission erred in calculating the amount of earnings loss. In order to fully understand this argument, the following evidence must be examined.

At some point prior to commencement of claimant's employment, General Electric had instituted certain job classifications which designated the employment duties and rate of pay for a particular job. Claimant was hired in March 1977 to perform the duties of a job classification known as R2. At the time of her accident on December 6, 1978, claimant had been promoted to a job classification known as R10 and was earning $5.82 per hour ($232.80 per week).

During the nine-month period in 1981 when claimant returned to work, she performed various "light duty" tasks. When claimant's employment was terminated at the end of this period, she was again performing the duties of the job classification known as R2. At the time

of the hearing before the Commission, R10 employees were earning $8.915 per hour (approximately $356 per week) and R2 employees were earning $8.485 per hour ($339.40 per week).

Claimant testified at the hearing before the arbitrator that she had been unable to secure employment even though she had interviewed for approximately 40 jobs between January 29, 1983, and the date of the hearing. However, claimant testified at the hearing before the Commission that she obtained employment as a waitress on May 6, 1983. Claimant introduced the payroll records of her new employer which indicated that she earned an average salary of $93.64 per week.

The Commission awarded claimant earnings loss benefits equal to 66⅔% of the difference between the amount she would have earned at the time of the hearing ($356 per week) in the job classification in which she was working at the time of the accident (R10) and the amount she was earning as a waitress at the time of the hearing.

General Electric asserts that the Commission erred in awarding compensation based on a wage differential between the amount claimant would have been earning as an R10 employee at the time of the hearing and the amount she was earning as a waitress. General Electric maintains that the award should have been based on the difference between the amount claimant would have earned as an R10 employee at the time of her injury and the amount which she would have earned at the time of the hearing in the R2 job classification which she had when she last worked for General Electric.

In support of this argument, General Electric asserts that: (1) claimant was laid off due to lack of work from her position as an R2 employee, and (2) as a result, the amount which she could have earned at the time of the hearing as an R2 employee more accurately measures her earning capacity after the accident than does the amount which she actually earned as a waitress. We do not agree.

■ We previously have rejected General Electric's contention that claimant's employment was terminated due to lack of work rather than her physical disability. In addition, section 8(d)(1) requires the Commission to determine the "average amount [which a claimant] is earning or is able to earn in some suitable employment or business after the accident." (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(d)(1).) In this case, claimant was actually earning $93.64 per week as a waitress, and there was no indication either that claimant would be recalled to work as an R2 employee for General Electric, or that she would be physically able to perform the duties of an R2 employee if she were recalled. Accordingly, we conclude that the Commission properly found that claimant's salary as a waitress was the proper

measure of the amount that she was earning in a suitable employment after the accident.

Although the issue which General Electric raises concerning the calculation of the wage-differential award focuses on the proper measure of claimant's diminished earning capacity after the accident, in the case at bar the Commission also calculated the wage-differential award based in part on the amount claimant would have earned as an R10 employee at the time of the hearing rather than on the amount that she actually earned as an R10 employee at the time of the accident. General Electric challenges the propriety of this aspect of the Commission's calculation; therefore, in order to fully address General Electric's contention that the Commission erred in calculating the wage-differential award, we must determine whether the Commission properly based the award on the amount that claimant would have been earning at the time of the hearing in the job which she had at the time of the accident rather than the amount that claimant earned in that job at the time of the accident.

Prior to 1975, section 8(d)(1) stated that a wage-differential award should be based on a percentage of the difference between the "average amount which [claimant] earned before the accident and the average amount which [a claimant] is earning or is able to earn in some suitable employment or business after the accident." (Ill. Rev. Stat. 1973, ch. 48, par. 138.8(d)(1).) It was well established prior to 1975 that the Commission was required to calculate a wage-differential award based in part on the average amount a claimant earned before the accident. (J. L. Simmons Co. v. Industrial Com. (1965), 32 Ill. 2d 194, 196, 204 N.E.2d 753, 754.) However, Public Act 79—79, which became effective on July 1, 1975, inserted the phrase "average amount which he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident" in place of the phrase "the average amount which he earned before the accident." We are aware of no case which has specifically interpreted the new language of section 8(d)(1). We recognize, however, that the court in General Electric Co. v. Industrial Com. (1982), 89 Ill. 2d 432, 435, 433 N.E.2d 671, 672, which was interpreting a different portion of Public Act 79—79, stated in dicta that "the Commission's award was based on the difference between what she earned before her accident and what she earned after she recovered from surgery." However, the foregoing dicta is not dispositive of the issue presented in this case because this issue was neither presented to, nor considered by, the court.

■■ ■ It is well established in Illinois that an amendment to an

unambiguous statute indicates a legislative intention to change the law, and it is presumed that every amendment is made for some purpose. In addition, courts must give effect to the amended law in a manner consistent with the amendment. (*Kosoglad v. Porcelli* (1985), 132 Ill. App. 3d 1081, 1086, 478 N.E.2d 489, 493.) In the case at bar, the language of section 8(d)(1) prior to 1975 clearly indicated that wage-differential awards should be based on the amount "earned before the accident." However, the language of section 8(d)(1) after the 1975 amendment indicates that the Commission should calculate wage-differential awards based on the amount that a claimant "would be able to earn" at the time of the hearing if the claimant were able to fully perform the duties of the occupation in which he was engaged at the time of the accident. There is no evidence suggesting that claimant would not still be employed in a job classification of R10 if she had not been injured. Accordingly, we conclude that the Commission properly elected to compute the wage-differential award based in part on the amount claimant would have been earning at the time of the hearing rather than the amount she was earning at the time of the accident.

In further support of our conclusion, we note that this change in the basis of computation provides a more realistic indication of the diminution in earning capacity of an injured worker. For example, the average amount that claimant is actually earning at the time of the hearing will reflect any general increase or decrease in wage rates which have occurred during the possibly lengthy period between the date of the accident and the date of the hearing. If the average amount that a claimant currently earns is deducted from the average amount that the claimant earned prior to the accident, the diminution in earning capacity will not be measured accurately if there has been any general change in wage rates. However, if the diminution in earning capacity is calculated by deducting a claimant's current wages from the amount that the claimant would have earned at the time of the hearing in the job the claimant had prior to the accident, any general change in wage rates properly will be taken into account.

██ General Electric's final contention is that the amount of earnings-loss benefits awarded to claimant under section 8(d)(1) is greater than the maximum compensation rate for such benefits. In support of this contention, General Electric notes that section 8(d)(1) provides that wage-differential awards shall be subject to the "limitations as to maximum amounts fixed by paragraph (b) of this Section." (Ill. Rev. Stat. 1983, ch. 48, par. 138.8(d)(1).) Specifically, Gen-

eral Electric asserts that section 8(b)(2) limits the maximum amount of earnings loss benefits to 66²/₃% of a claimant's average weekly wage at the time of the accident. General Electric maintains that in the case at bar, such a maximum limit would be $155.20, which equals 66²/₃% of the amount claimant earned at the time of the accident as an R10 employee ($232.80).

Section 8(b)(2) provides in part:

"The compensation rate in all cases other than for temporary total disability under this paragraph (b), and other than for serious and permanent disfigurement under paragraph (c) and other than for permanent partial disability under subparagraph (2) of paragraph (d) or under paragraph (e), of this Section shall be equal to 66²/₃% of the employee's average weekly wage computed in accordance with the provisions of Section 10, provided that it shall be not less than the following amounts in the following cases:

$80.90 in case of a single person;

\* \* \*

nor exceed the employee's average weekly wage computed in accordance with the provisions of Section 10, whichever is less." (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 138.8(b)(2).)

General Electric further notes that section 10 defines the term "average weekly wage" as follows:

"the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury \* \* \*." Ill. Rev. Stat. 1983, ch. 48, par. 138.10.

There is nothing in the record which indicates that General Electric raised the foregoing issue in the circuit court; consequently, we need not consider it on review. (*Penny Cab Co. v. Industrial Com.* (1975), 60 Ill. 2d 217, 220, 326 N.E.2d 393, 395.) In any event, however, we do not agree with General Electric's contentions in this regard.

We recognize that section 8(d)(1) wage-differential awards are subject to the limitations as to maximum amounts fixed in section 8(b). However, the maximum limitations referred to in section 8(d)(1) are not contained in section 8(b)(2), relied upon by General Electric. On the contrary, section 8(b)(2) sets forth a method of calculating certain benefits. For example, section 7(a) provides that the compensation rate in fatal cases must be "computed in accordance with subparagraph 2 of paragraph (b) of Section 8." (Ill. Rev. Stat. 1983, ch.

48, par. 138.7(a); *United Airlines v. Industrial Com.* (1980), 89 Ill. App. 3d 387, 390, 411 N.E.2d 1009, 1011.) Section 8(b)(2) provides in turn that the compensation rates must be "computed in accordance with the provisions of Section 10." (Ill. Rev. Stat., 1984 Supp., ch. 48, pars. 138.8(b)(2), 138.10.) In this regard, General Electric urges for the first time on appeal that it is impermissible for a wage differential award under section 8(d)(1) to exceed total temporary disability awards and the specific schedule of awards set forth under other provisions of the Workers' Compensation Act. We reject this contention, as did the court in *General Electric Co. v. Industrial Com.* (1982), 89 Ill. 2d 432, 437-38, 433 N.E.2d 671, 673-74, previously quoted by us. The supreme court, in commenting on the nation-wide trend to view specific, scheduled allowances as nonexclusive, there stated:

> "This trend is supported by sound reasons. Scheduled awards are often not fair. For example, partial loss of use of a finger may be an annoyance to some workers, but a catastrophe for a violinist. Nor are scheduled allowances always fast and certain. It is often easier to calculate how much a claimant's earnings have decreased since the accident than to assign a percentage partial loss of use. Exclusive scheduled awards cannot be justified as a kind of liquidated damages, an unchallengeable estimate of earnings loss. Rather, the schedule represents a presumed minimum loss \*\*\*. \*\*\* The worker is allowed to recover the scheduled amount without having to demonstrate how the expected eventual loss of earnings will come about. If, however, he can prove an actual loss of earnings greater than the schedule presumes, there is no reason why he should not recover that loss. In theory, the basis of the workers' compensation system should be earnings loss, not the schedule." (89 Ill. 2d 432, 437-38, 433 N.E.2d 671, 673-74.)

In addition, section 8(b)(2) provides that certain benefit payments "shall not be less than" certain stated amounts which vary according to the number of claimant's dependents, "nor exceed the employee's average weekly wage computed [under] Section 10, whichever is less." (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 138.8(b)(2).) In *United Airlines v. Industrial Com.* (1980), 89 Ill. App. 3d 387, 390, 411 N.E.2d 1009, 1011, the court determined that the foregoing language indicates that section 8(b)(2) fixes minimum levels of certain compensation in various alternative situations but not maximum levels of such benefits. Accordingly, we reject General Electric's contention that section 8(b)(2) fixes the maximum amount of earnings-loss

benefits which may be awarded under section 8(d)(1).

After reviewing the provisions of section 8(b), we conclude that the limitations as to maximum amounts of wage-differential awards referred to in section 8(d)(1) are set forth in sections 8(b)(4) and 8(b)(5) (Ill. Rev. Stat., 1984 Supp., ch. 48, pars. 138.8(b)(4), (5)). (*Cf. United Airlines v. Industrial Com.* (1980), 89 Ill. App. 3d 387, 390, 411 N.E.2d 1009, 1011.) Specifically, these sections contain the maximum weekly compensation rates for various types of awards, including wage-differential awards. We further conclude, however, that neither section 8(b)(4) or 8(b)(5) contain any limitation on the Industrial Commission's awards in the case at bar.

■ We deem it noteworthy that section 8(d)(1) provides that awards thereunder are to be based on the difference between the "average amount" the employee would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of injury and the "average amount" he is earning or is able to earn in some suitable employment after his injury. However, General Electric has seen fit not to address the question of the propriety of the award in this regard. Therefore, we conclude that General Electric has waived any error that may have resulted from the fact that the Industrial Commission based the employee's award in the case at bar on the actual wages earned by the employee at the time of her injury and after she returned to work, rather than the "average amount" of such earnings. General Electric has the burden of establishing that the Industrial Commission's calculation of the wage-differential award constitutes an abuse of discretion. (See *Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 413, 454 N.E.2d 723, 732.) In this regard, General Electric has failed to introduce any evidence or present any argument as to whether claimant's award exceeded the "average amount" of her salary at the time of her injury and after her recovery or that it exceeded the maximum weekly compensation rates contained in sections 8(b)(4) and 8(b)(5). Accordingly, we conclude that the Industrial Commission did not abuse its discretion in calculating earnings loss benefits awarded to claimant.

For the reasons stated herein, we affirm the judgment of the circuit court of McLean County.

Affirmed.

WEBBER, P.J., and BARRY, LINDBERG, McNAMARA, JJ., concur.