BANK OF CHICAGO, f/k/a Bank of Chicago-Garfield Ridge, Plaintiff-Appellee and Cross-Appellant, v. PARK NATIONAL BANK, Defendant-Appellant and Cross-Appellee (Sheldon Bernstein, Cross-Appellee).

First District (2nd Division)   No. 1—93—1594

Opinion filed September 27, 1994.

Jones, Day, Reavis & Pogue, of Chicago (James Daly, Irene Savanis, and Nancy Tanck, of counsel), for appellant.

Holleb & Coff, of Chicago (Paul Fox, Richard Rhodes, and Lori Goldstein, of counsel), for appellee Bank of Chicago.

Kwiatt & Silverman, Ltd., of Chicago (A. Marcy Newman and Michael Silverman, of counsel), for appellee Sheldon Bernstein.

JUSTICE HARTMAN delivered the opinion of the court:

On November 4, 1988, plaintiff Bank of Chicago (formerly Bank of Chicago-Garfield Ridge) (Garfield) entered into a loan participation agreement with defendant Park National Bank (Park) in which Garfield purchased a $1 million participation in Park's loans to Evron Industries, Ltd. (Evron), secured by a blanket assignment of Evron's corporate assets. Evron subsequently defaulted on its loans and filed for bankruptcy. Garfield commenced this lawsuit against Park and its senior vice-president, Sheldon Bernstein. Following a bench trial, the circuit court determined that Park had breached its agreement to subordinate its interest in the Evron collateral to Garfield and had breached its agreement to obtain Garfield's consent to a change in the interest rate on the Evron lending. The court entered judgment

in favor of Bernstein on Garfield's claim against him personally. The court also entered judgment against Park on its counterclaim, denying it *pro rata* reimbursement for its costs in liquidating the Evron collateral.[1]

The issues presented in this appeal are whether the circuit court erred (1) in finding that Park subordinated its interest in the Evron collateral to Garfield and in awarding Garfield the amount of its original $1 million participation plus prejudgment interest; (2) in ruling that Park breached the agreement by increasing Evron's interest rate without Garfield's consent; (3) in finding that Garfield was not obligated to contribute a *pro rata* share of Park's expenses in liquidating the Evron collateral; (4) on cross-appeal, in finding against Garfield on its claims of fraud or misrepresentation; (5) on cross-appeal, in determining that Park had no duty to repurchase Garfield's participation; (6) on cross-appeal, in holding that Park did not breach its agreement by releasing a guarantor without Garfield's consent; and (7) on cross-appeal, in denying Garfield's motion to amend its pleadings during trial.

On October 15, 1988, Bernstein wrote a letter to Garfield's executive vice-president, Marc J. Holland, soliciting Garfield's participation for $1 million in Park's lending to Evron. Bernstein's letter asked Holland to participate "in either of the two notes we hold for the company's revolving line of credit (original balances of $1,400,000.00 and $1,000,000.00 respectively)" and to commit "for up to one year." Holland testified that Garfield's executive committee agreed to participate upon the following three conditions: (1) the total lending to Evron not exceed the aggregate of 75% of Evron's accounts receivable and 25% of its inventory; (2) Garfield would have a first position ahead of Park in the collateral; and (3) the participation would last 90 to 120 days. Holland relayed the three conditions to Bernstein that same day, and Bernstein agreed to them. Bernstein acknowledged the three conditions as "provisos."

On November 4, 1988, Garfield and Park signed a participation agreement certificate that obligated Park to remit to Garfield its proportionate share of principal and interest payments as they were received from Evron; in the event of default, collateral was to be applied *pro rata* to the payment of the balances of principal and interest then due on the respective participations. Park expressly

---

[1]This is the second appeal taken in this case. In the previous appeal, we upheld the circuit court's ruling that Garfield could not set off amounts from this suit against the proceeds of an unrelated agreement between Garfield and Park. 237 Ill. App. 3d 1085, 606 N.E.2d 72.

stated that it made no representation or warranty and had no responsibility for the collectibility of the loan or Evron's financial condition. On the same day the parties signed the certificate agreement, however, Bernstein gave Holland a letter (Letter) which, in its entirety, provided:

"Park National Bank of Chicago agrees that *future* advances to Evron Industries will not exceed the total of 75% of their receivables due within 90 days plus 25% of their inventory. In addition, Park National Bank *subordinates* its position on the collateral pledged to secure this loan to Garfield Ridge Trust and Savings Bank.

This participation will expire on March 3, 1989." (Emphasis added.)

Holland testified that Bernstein agreed to prepare the Letter as an "addendum" to their contract. If the certificate and "addendum" Letter conflicted, Holland understood that the Letter controlled. Bernstein testified that the Letter was "additional information" and "did not know" if he intended the Letter to supplement or modify the agreement.

According to Holland, Bernstein never suggested that Park's subordination of its position in the Evron collateral would be restricted to future advances only. Although the term "future advances" in the Letter's first sentence was inaccurate, Holland did not bring this to Bernstein's attention. Contrariwise, Bernstein believed the subordination condition, contained in the second sentence of the Letter, was restricted to future advances only.

On February 28, 1990, Evron filed for bankruptcy. Five banks, including Garfield and Park, had participated in six Evron loans secured by a blanket assignment of its corporate assets, the principal loan amounts due being $4,873,993. The proceeds from the liquidation of the Evron collateral totalled $1,556,465 in cash and $500,000 in promissory notes executed by the purchaser of the assets. The interest paid on the notes and accrued on the cash portion of the liquidation proceeds totalled $149,095.81 at the time of trial. Park represented the lenders in the bankruptcy proceedings and incurred expenses totalling $302,577.42.

Garfield brought an action against Park for a declaratory judgment and rescission seeking, in count I, a declaration of Park's duty under the participation agreement to repurchase Garfield's interest. Count II sought a declaration of Park's duty to subordinate its interest in the Evron collateral in favor of Garfield. Count III sought damages for breach of contract alleging Park lent to Evron amounts in excess of the participation agreement formula; failed to

obtain Garfield's consent when it increased Evron's interest rate; failed to obtain Garfield's consent before releasing a personal guaranty; and failed to pay Garfield interest accrued on the notes from the liquidation. In the alternative, counts IV and V requested rescission based on fraud and innocent misrepresentation. Count VI was a claim of fraud against both Park and Bernstein. Park's counterclaim sought to recover Garfield's proportionate share of the collection expenses incurred in liquidating the Evron collateral.

Following a bench trial, the circuit court found that Park had no duty to repurchase Garfield's participation and that neither Park nor Bernstein had made fraudulent or innocent misrepresentations. The court determined that Park had subordinated its position in the Evron collateral to Garfield. The court ruled that the subordination clause extended to all of Park's lending to Evron and that Park, as the drafter of the November 4 Letter, could have limited the subordination to future advances if that was its intent. The court awarded Garfield its $1 million participation, $118,356.66 in prejudgment interest and $1,000 in nominal damages for Park's breach of the participation agreement by failing to obtain Garfield's consent to the interest rate increase and by failing to remit interest on the loans received from the collateral sale. The court also entered judgment against Park on its counterclaim. The appeal and cross-appeal followed.

# I

Park contends the circuit court erred in declaring subordination of its interest and in awarding Garfield full repayment of its participation in the Evron lending.

■ Park argues the circuit court's finding that it owed a duty to subordinate is irreconcilable with the finding that it had no duty to repurchase Garfield's participation because the court found the Letter's subordination clause part of the participation agreement but disregarded the Letter's "expiration" language. The court's rulings were not inconsistent: the agreement's "expiration" language was not a specific promise to repurchase; the subordination language, however, was express.

■ Park asserts the court's ruling that it subordinated its interest in the collateral to Garfield is contrary to Federal and State banking regulations that "require" *pro rata* sharing of collateral in a loan participation, citing 12 C.F.R. § 32.107 (1991) (section 32.107). Similarly, Park argues, the Federal Deposit Insurance Corporation's manual of examination policies as well as the Illinois Commissioner of Banks and Trust Companies policy guidelines preclude recourse

agreements that defeat a proportionate sharing of the risk. The regulations do not "require" a *pro rata* sharing of collateral proceeds; they set forth how regulators treat participations on the lead bank's (Park's) books for purposes of lending limits.

A participation agreement is a shared loan where a lead financial institution divides and sells to other banks portions of a loan it has made. (*First National Bank v. Clay-Hensley Comm'n Co.* (1988), 170 Ill. App. 3d 898, 901-02, 525 N.E.2d 217 (*Bank of Belleville*).) Participation agreements are sought when a borrower requests a loan in excess of a lending institution's statutory ceiling, among other reasons; lenders then pool their financial resources to provide the amount requested. (*Bank of Belleville*, 170 Ill. App. 3d at 902.) A participation agreement may include a covenant detailing " 'the treatment of the collateral and any proceeds thereof, and of any funds received on account of the loan principal or interest, and the procedures to be followed in case of default.' " *Bank of Belleville*, 170 Ill. App. 3d at 902-03, quoting Simpson, *Loan Participations: Pitfalls for Participants*, 31 Bus. Law. 1977, 1981 (1976).

In an analogous case, *Drovers Bank v. National Bank & Trust Co.* (8th Cir. 1987), 829 F.2d 20, 21-22, two banks entered a participation agreement and oral addendum requiring the lead bank to repay the participant's share first. The court rejected the argument that section 32.107, relied upon by Park here, conflicted with the oral contract and required a *pro rata* sharing of the proceeds in the event of default, finding that section 32.107 is part of the regulatory scheme imposing lending limits on national banks which allows banks to exclude the amount of certain participation loans from the calculation of their lending ceilings. *Drovers Bank*, 829 F.2d at 22.

Section 32.107, then, does not "require" a *pro rata* sharing of risk in all circumstances, but that a lead bank demand *pro rata* risk sharing if it records the lending as a participation and excludes it from calculation of its lending limit. Accordingly, a lead bank may subordinate its interest but regulators will then treat the transaction as a loan subject to the bank's lending ceiling. Bernstein admitted that if banks deviate from a *pro rata* participation, the impact under the regulations is to move the risk back to the lead bank's books because the loan would be subject to the lead's lending limits. Garfield's chairman, William Cottle, accurately testified that participation agreements may contain any terms the parties agree to and do not require a *pro rata* sharing of the risk of default. (See *Bank of Belleville*, 170 Ill. App. 3d 898; *Drovers Bank*, 829 F.2d 20.) The circuit court's ruling is not contrary to Federal and State banking regulations.

■ Park's contention that Garfield understood the participation agreement to require proportionate risk sharing is meritless. There is no evidence that Garfield intended to share the risk of default proportionately; instead, Garfield insisted that Park subordinate its interest in the Evron collateral as a condition to Garfield's participation. In response, Park drafted the Letter subordinating its interest to Garfield. Accordingly, Park has failed to present any evidence that Garfield "intended" to share proportionately the risk merely because it recorded the transaction as a "participation" on its books.

Park urges that Garfield did not expect a first position in the collateral ahead of the other participating lenders because Park only subordinated its own partial interest in the collateral. To the contrary, Holland testified he knew Evron had $5 million in bank debt secured by its corporate assets; Park held $2.4 million of that debt prior to Garfield's participation; Park had a first position in the collateral as to other participants; Park's position as well as any other lender's position was subordinated to Garfield; and he did not care if there was additional debt cross-collateralized as long as that debt collateral was second to Park's position. Park's argument that it only subordinated its own interest in the collateral and not the interests of other participants is irrelevant. In a participation, the lead bank is the only secured party. (*Bank of Belleville*, 170 Ill. App. 3d at 904, quoting Armstrong, *The Developing Law of Participation Agreements*, 23 Bus. Law. 689, 693-96 (1968).) Consequently, Park's attempt to assign percentages in the collateral is baseless. Park, as lead bank, had a priority position in 100% of the collateral which it fully subordinated to Garfield.

■ Garfield did not treat the subordination as applying only to future advances by never asserting its right to a first position in the collateral, as Park alleges. The reference to "future advances" in the first sentence of the November 4 Letter did not refer to the subordination clause in the second sentence. The language of the Letter affords the sole criterion of the parties' intentions because its terms are plain and unambiguous. (*Boulevard Bank National Association v. Philips Medical Systems International B.V.* (N.D. Ill. 1993), 811 F. Supp. 357, 365.) The Letter does not limit the subordination clause to future advances.

Park contends that the circuit court's finding of its subordination is contrary to the clear terms of the participation agreement, which provided for *pro rata* sharing of the Evron collateral. The two instruments were executed by the same contracting parties in the course of the same transaction and must be considered together and construed with reference to one another because they are one

contract. (*In re Estate of Croake* (1991), 218 Ill. App. 3d 124, 126, 578 N.E.2d 567.) The primary objective is to give effect to the intent of the parties, which should be determined from the language employed. (*Manor Healthcare Corp. v. Soiltest, Inc.* (1989), 192 Ill. App. 3d 934, 940, 549 N.E.2d 719.) Terms are not rendered ambiguous simply because the parties do not agree upon their meaning. *Manor Healthcare*, 192 Ill. App. 3d at 940.

■ The evidence supports the circuit court's determination that the November 4 Letter contained additional terms that superseded the certificate agreement's boilerplate language. Garfield's executive committee refused to participate in the Evron lending unless certain conditions were added to the agreement, including Park's commitment to subordinate its position in the collateral. Holland testified that Bernstein agreed to prepare the Letter as an "addendum" that would be part of the parties' agreement; the certificate agreement and Letter were exchanged when Holland and Bernstein met to finalize the contract. Bernstein testified that the Letter was "additional information" but could not remember whether he intended the Letter to supplement or modify the agreement. Construing the two documents together, the circuit court correctly held that the agreement unambiguously provides that Park agreed to subordinate its interest to Garfield.

■ Park next suggests that in awarding Garfield its full $1 million participation, the circuit court contradicted its findings that Park had no duty to repurchase the participation and that rescission was not equitable. Park avers that this award has the same effect as a repurchase or rescission. Garfield received its full participation, however, simply because there was sufficient value in the collateral that had been subordinated by Park. The fact that the result had the same practical effect as a repurchase or rescission is irrelevant.

Participants can look only to their lead bank for satisfaction of claims arising out of the transaction; they are not themselves creditors of the borrower and so cannot assert creditor claims against the borrower. (*Bank of Belleville*, 170 Ill. App. 3d at 904, quoting Armstrong, *The Developing Law of Participation Agreements*, 23 Bus. Law. 689, 693-96 (1968).) Park was the only party with a security interest in the Evron collateral and subordinated that entire interest to Garfield. As a result, Garfield contracted for a first position in all of Evron's collateral and was entitled to receive proceeds satisfying its loan participation.

■ Park also claims that the circuit court erred in awarding Garfield's damages solely in cash rather than from the promissory note portion of the collateral proceeds. Although the court had no

factual or legal basis for imposing such a priority scheme on the collateral proceeds, Park cites no case law prohibiting a circuit judge from granting a secured party priority in the cash proceeds of a collateral sale, particularly in the absence of any agreement by the parties to the contrary. Since Garfield held the first position in the collateral and the proceeds were in excess of its participation, Garfield was entitled to recover its full loan. The fact that the court awarded repayment strictly from the cash proceeds was not an abuse of its discretion.

∎ Park lastly asserts, in this branch of the case, that the circuit court erred in awarding prejudgment interest because damages in the case were not liquidated. Absent an express agreement between the parties, allowance of prejudgment interest is permitted by statute if the amount due is a fixed amount or easily computed (*Cushman & Wakefield of Illinois, Inc. v. Northbrook 500 Ltd. Partnership* (1983), 112 Ill. App. 3d 951, 963, 445 N.E.2d 1313; 815 ILCS 205/2 (West 1992)), and interest can be awarded on money payable even when the claimed right and the amount due require legal ascertainment, notwithstanding the fact that the parties could reasonably differ as to their liability. (*Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 251, 323 N.E.2d 73.) The decision to allow statutory interest lies within the sound discretion of the circuit court. *Hadley Gear Manufacturing Co. v. Zmigrocki* (1986), 152 Ill. App. 3d 358, 502 N.E.2d 6.

Here, Garfield's participation was subject to exact computation. The circuit court did not abuse its discretion in awarding prejudgment interest.

## II

Park avers the circuit court erred in finding that it breached the participation agreement by increasing the interest rate on the participated notes. Park reasons it had discretion to increase the interest rate because it was done "in the course of the routine administration of the loan," as authorized by the agreement.

On November 28, 1988, Park decided unilaterally to increase the interest rate on the Evron loans to 1% over prime. Park passed on to Garfield its proportionate share of the increase amounting to an additional $8,300 over a 10-month period. Bernstein testified that the increase was to cover rising administrative expenses but admitted that an interest rate increase could be a response to either rising expense or increased risk. The circuit court found Bernstein's testimony that the rate was increased to offset administrative costs "rather incredible." Instead, the court ruled that the increase to 1%

over prime materially increased the risk involved and awarded nominal damages of $1,000.

■ Garfield, however, failed to present any evidence on the element of damage. In fact, Garfield accepted the benefits of the increased interest rate without complaint. Garfield's claim that it was injured by losing the opportunity to obtain repayment of its participation is defeated by the court's finding that Park owed no duty to repurchase the participation. Garfield's damages were merely speculative, and the "nominal" award must be reversed.

## III

■ Park argues the circuit court erred in entering judgment against it on its counterclaim and seeks Garfield's proportionate contribution of Park's expenses in liquidating the Evron collateral as required by the agreement. The proceeds from the liquidation of the Evron collateral totalled $1,556,465 in cash and $500,000 in promissory notes. In representing the lenders in the bankruptcy proceedings, Park incurred expenses totalling $302,577.42. Contrary to Park's contention, however, the agreement addresses the division of expenses incurred in administering the loan, not the disposal of collateral after default.

Section 9—504 of the Uniform Commercial Code (810 ILCS 5/9—504 (West 1992)) provides a priority scheme for disposing of the proceeds of collateral where secured creditors are involved. The proceeds are first applied to expenses of sale and then to the satisfaction of indebtedness. Here, the liquidation of the Evron collateral produced funds sufficient to pay all of Park's expenses totalling $302,577.42. The remaining funds ($1,253,887.58 in cash and $500,000 in notes) were then applied to the "satisfaction of indebtedness" based on the creditors' position in the collateral. As a result, Garfield was entitled to recover its full $1 million participation since it held first position in the collateral as a result of the subordination agreement. The remaining funds would then go to Park as subordinate security interest. There was no error since Park received reimbursement for all of its expenses first as required by section 9—504. The fact that the remaining proceeds from the Evron collateral exceeded Garfield's participation was entirely fortuitous and did not deprive Park of any reimbursement costs.

## IV

On cross-appeal, Garfield declares that Park, through Bernstein, induced it to enter the participation agreement by withholding material information and misrepresenting material facts.

The requisite elements of a common law fraud cause of action are that a false statement of material fact was intentionally made, that the party to whom the statement was made had a right to rely on it and did so, that the statement was made for the purpose of inducing the other party to act, and that reliance by the person to whom the statement was made led to his injury. (*Zimmerman v. Northfield Real Estate, Inc.* (1986), 156 Ill. App. 3d 154, 161, 510 N.E.2d 409, *appeal denied* (1987), 116 Ill. 2d 578, 515 N.E.2d 129.) Fraud must be proved by clear and convincing evidence and the circuit court's decision will not be overturned unless it is against the manifest weight of the evidence. *In re Marriage of Morris* (1986), 147 Ill. App. 3d 380, 393, 497 N.E.2d 1173.

Participation agreements are arm's length contracts between sophisticated financial institutions and do not establish fiduciary relationships. (*In re Colocotronis Tanker Securities Litigation* (S.D.N.Y. 1978), 449 F. Supp. 828, 833.) As in other commercial transactions, the participants are held to marketplace standards of vigilance and independent inspections. (*Northern Trust Co. v. Federal Deposit Insurance Corp.* (W.D. Okla. 1985), 619 F. Supp. 1340, 1344.) Therefore, banks should conduct independent and prudent evaluations of loans offered for participation. See *Northern Trust Co.*, 619 F. Supp. at 1344.

In the instant case, Garfield has failed to prove that Bernstein or Park misrepresented Evron's financial condition by clear and convincing evidence. Park provided Garfield with financial documents that disclosed Evron's total bank debt. Park's three-day advance of funds to enhance Evron's cash position was not fraudulent; the financial statements given to Garfield reflected that loan as a liability. The interest rate increase was constructively known to Garfield because it received the increased interest income. Garfield maintains Park should have informed it of concerns harbored by Park's president, Raymond J. Allen, regarding the Evron lending. Bernstein, however, did not share these concerns so he never disclosed them. Garfield also contends the court erred in drawing an adverse inference from its failure to call Evron's owner as a witness. The court's comment does not require reversal, particularly since Garfield claimed Park misrepresented Evron's financial condition and Evron's owner could have offered important testimony on this point.

Garfield entered into an arm's length commercial transaction and, under Federal Deposit Insurance Corporation guidelines, should have performed the same degree of independent credit analysis of the loan as if it were Park. Garfield failed to follow its own loan policy as well as Federal and State guidelines with respect to the

Evron participation. Garfield never asked about the amount of debt set forth in Evron's financial statements, or asked to have Evron's collateral appraised, or requested Evron's loan history or copies of its collateral documents and the notes reflecting its debt, or visited Evron, or obtained a Dun & Bradstreet credit report. Garfield simply failed to perform the requisite independent credit analysis and, instead, relied on Park's analysis of the Evron lending. One may not enter into a transaction with eyes closed to available information and then charge deception by another. (*Central States Joint Board v. Continental Assurance Co.* (1983), 117 Ill. App. 3d 600, 606, 453 N.E.2d 932.) The circuit court's finding that Park and Bernstein did not fraudulently induce Garfield's participation was not against the manifest weight of the evidence.

## V

Garfield next argues that Park breached the participation agreement by not honoring the March 3, 1989, expiration date.

Bernstein's November 4 Letter to Holland stated that "[t]his participation will expire on March 3, 1989." Garfield recorded the transaction as a participation and not as a loan to Park. Bernstein admitted that he knew Garfield only wanted to be in the loan 120 to 180 days and that when an expiration date expires, the participant has a right to request payment. On February 3, 1989, Bernstein wrote Holland a letter asking him to remain in the credit for 30 to 45 days. Although Garfield believed the participation had expired and was awaiting payment, it felt the loan was secure and did not lean on Park because of their past working history. Garfield continued to receive its *pro rata* share of the interest throughout 1989. Holland recorded the March 3, 1989, reference in the letter as a date to review the transaction and not the maturity date. He believed Garfield had an absolute right to demand that Park repurchase the participation after March 3, 1989; yet, Garfield did not demand that Park repurchase its participation interest until after Evron filed for bankruptcy.

The evidence here does not establish that the parties intended the participation agreement to constitute a loan by Garfield to Park with recourse against Park. Although Garfield believed it had an absolute right to demand repayment after the expiration date, Holland recorded it as a date to review the transaction rather than as a maturity date. Further, Garfield continued its participation beyond the expiration date by accepting interest payments without protest.

The circuit court did not err in concluding that Park had no duty to repurchase Garfield's participation.

## VI

Garfield alleges the circuit court erred in holding that Park did not breach the agreement by releasing the guaranty of Evron's principal shareholder, Harvey Udesky, in bankruptcy.

After Evron filed for bankruptcy, Garfield looked to Park to handle the proceedings. Park released Udesky's personal guaranty and its collateral interest in his home. Udesky's net worth at the time was less than $40,000. Garfield did not discover the release until after the bankruptcy proceedings. The circuit court found that Park had no right to release Udesky's guaranty without Garfield's consent but held that Garfield's conduct during the bankruptcy proceedings was "so casual and equivocal" as to be "tantamount to consent to waive or release the security."

■ The participation certificate expressly provided that Park would not waive or release any guaranty without Garfield's consent. Although Park exercised sole discretion under circumstances that related to "routine administration," the release of a guaranty does not constitute a routine administrative task. Therefore, Park breached the agreement by failing to obtain Garfield's consent to the release. In addition, the circuit court's finding of waiver was against the manifest weight of the evidence. Garfield could not have waived consent by its conduct during the bankruptcy proceedings when the release was never disclosed to either Garfield or the bankruptcy court.

Notwithstanding the foregoing, Garfield has failed to establish any damages from the breach. Garfield's lack of injury supports the circuit court's conclusion that the release of the guaranty was not a material breach.

## VII

Garfield's final contention is that the circuit court erred in denying it leave to file a fourth amended complaint that alleged a consumer fraud claim. Garfield made the motion, which raised no new factual allegations, 10 days into trial at the close of its case in chief.

■ The circuit court did not abuse its broad discretion in ruling on the untimely motion to amend pleadings. (*Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 413, 454 N.E.2d 723.) Amendments ordinarily will not be permitted after trial has begun if the proposed amendment raises matters of which the pleader had full knowledge at the time of interposing the original pleading and there is no excuse for failing to raise those matters in the original pleading. *Stringer Construction Co. v. Chicago Housing Authority* (1990), 206 Ill. App. 3d 250, 260, 563 N.E.2d 819.

For the above-stated reasons, the circuit court's judgment must be affirmed, except for the award of nominal damages for Park's unauthorized increase of the loans' interest rate, which is reversed.

Affirmed in part; reversed in part.

DiVITO, P.J., and McCORMICK, J., concur.