768 N.E.2d 182 (2002)
329 Ill. App.3d 606
263 Ill.Dec. 422
In re LIQUIDATION OF INTER-AMERICAN INSURANCE COMPNY OF ILLINOIS (Employers Reassurance Corporation, Plaintiff-Appellant,
v.
Nathaniel S. SHAPO, Director of Insurance, Defendant-Appellee).
No. 1-00-3340.
Appellate Court of Illinois, First District, First Division.
March 29, 2002.
*184 Mitchell A. Orpett, H. Wesley Sunu and Kevin A. Titus, Tribler, Orpett & Crone, P.C., Chicago, for Appellant.
Ellen G. Robinson and John Wickert, Robinson, Curley & Clayton, P.C., Mary Cannon Veed, Peterson & Ross, D. Daniel *185 Barr and J. Kevin Baldwin, Office of the Special Deputy Receiver, Chicago, for Appellee.
Justice COUSINS delivered the opinion of the court:
Appellant Employers Reassurance Corporation (ERAC) was one of seven reinsurers of now-insolvent life insurance provider Inter-American Insurance Company of Illinois (Inter-American). There were five reinsurance agreements in force between Inter-American and ERAC. In 1988, certain aspects of the segregated agreements were consolidated by the parties into a reinsurance agreement known as the "Segregated Asset Portfolio Agreement" (SAPA). But, the insuring agreements in the original contracts were not modified. Inter-American became insolvent and was declared insolvent on December 23, 1991, and the circuit court affirmed the Director of the Illinois Department of Insurance as the statutory liquidator (the Liquidator).
ERAC contended that its agreement with Inter-American was "executory" as to policyholders who had not died at liquidation. However, the Liquidator contended that the agreement was not executory. The matter was resolved in the Liquidator's favor on a cross-motion for declaratory relief. The trial court, after a full trial, also decided that ERAC had breached its reinsurance agreements with Inter-American by not paying the bills tendered to it by the Liquidator. During trial, the Liquidator requested leave to file its third amended counterclaim. In its final ruling, the trial court granted the Liquidator leave to file his amended counterclaim.
ERAC now presents the following issues upon appeal: (1) whether the contracts were executory; (2) whether the trial court erred in denying ERAC's motion for directed finding; (3) whether the trial court erred in granting the Liquidator's third motion to amend; and (4) assuming the trial court properly granted the Liquidator's third motion to amend, whether Inter-American provided consideration under the contract and established waiver by clear and convincing evidence.
For the reasons stated below, we affirm.

BACKGROUND
Inter-American entered into reinsurance contracts (Treaties) with ERAC, formerly known as Puritan Life Insurance Company, between 1984 and 1986. Pursuant to these Treaties, Inter-American was to cede reinsurance premiums to ERAC and ERAC was to assume the reinsurance as reported by Inter-American according to the Treaties. In December 1987, the Department advised Inter-American that it would not approve of the Treaties because, in the Department's view, they did not reflect a transfer of investment risk from the ceding company, Inter-American, to the reinsurer, ERAC. Amended Treaties were due to the Department on or before March 15, 1988. If not amended and received by then, the Department would "take action to disapprove the treaty and reserve credit will be disallowed."
To address the concerns of the Department, the parties entered into the agreement known as the SAPA in March 1988, nunc pro tunc January 1, 1988. The SAPA required Inter-American to establish and maintain assets in a portfolio. Articles V and VI of the SAPA required quarterly and year-end reporting of the investment results to ERAC. The insolvency clause in the SAPA provided, in part:
"The ceding insurer [Inter-American] and the reinsurer [ERAC] agree that, in the event of the insolvency of the ceding insurer, as to all reinsurance made, ceded, renewed or otherwise becoming effective after the effective date of this agreement, the reinsurance shall be payable *186 by the reinsurer on the basis of the amount of liability of the ceding insurer under the contract or contracts reinsured, without diminution because of the insolvency of the ceding insurer."
The SAPA further provided: "The total amount of the portfolio shall be adjusted by the REINSURED as of the end of each calendar year" as described by New York State Insurance Department Regulation 126 (Regulation 126). Inter-American made quarterly reports to ERAC from March 1988 through June 1991 and submitted reinsurance premium payments to ERAC.
Inter-American was declared insolvent on December 23, 1991. In September 1992, the Liquidator filed a petition to conditionally reject the "surplus relief agreements" entered into by Inter-American and to declare that they were not executory. ERAC filed a cross-motion for declaratory relief. In April 1994, ERAC filed a motion for summary judgment on its cross-motion for declaratory relief. The court later allowed ERAC's motion for summary judgment to be withdrawn. In September 1994, the liquidation court ruled that the policyholders who had not died by the date of liquidation could file claims against the estate for the current net present value of their policies. The court also approved the Liquidator's methodology for calculating the value of the policies.
The Liquidator filed a renewed crossmotion for declaratory relief against ERAC on July 26, 1995. ERAC filed its amended cross-motion for declaratory relief on the same date. In September 1995, the circuit court ruled that the reinsurance contracts were not executory. ERAC and Alabama Reassurance Company (Alabama Re) appealed that ruling. The Illinois Appellate Court dismissed the appeal in an unpublished order as premature. See In re Liquidation of Inter-American Insurance Co., 284 Ill.App.3d 1112, 237 Ill.Dec. 232, 708 N.E.2d 1272 (1996).
In November 1995, the Liquidator moved to dismiss counts II through VII of ERAC's amended cross-motion for declaratory relief. The circuit court denied the motion and ordered the Liquidator to answer those counts. In its answer, the Liquidator asserted its affirmative defenses: (1) laches; (2) waiver and estoppel; and (3) negligence by Inter-American. Additionally, the Liquidator presented a counterclaim for breach of contract.
In January 1997, ERAC moved to dismiss the Liquidator's counterclaim and filed its responses to the Liquidator's affirmative defenses. The Liquidator filed an amended counterclaim asserting breach of contract and quantum meruit. ERAC filed a motion to dismiss the Liquidator's quantum meruit claim and also filed an answer to the breach of contract claim. The parties submitted an agreed order dismissing the quantum meruit count.
An agreed pretrial stipulation was filed by the parties in May 1998. On May 11, 1998, the Liquidator filed its revised second amended counterclaim, which alleged that Inter-American performed all of its material obligations under the Treaties and that ERAC breached the contract by refusing to pay the sums to Inter-Americans policyholders. The trial commenced in June 1998.
Rick Browne of Inter-American testified for the Liquidator that when he discussed the SAPA drafts with James Maughn of ERAC, they discussed Inter-American's "ability to do Regulation 126 type testing or asset adequacy analysis, that Inter-American at that time was not equipped, did not have the systems to do that, but that we wouldwe both knew that it was a requirement that insurance companies were going to have to do this type of *187 testing in the near future." Browne had several conversations with Maughn relative to what assets where in the segregated asset portfolio and what sort of reporting was provided to ERAC by Inter-American. Browne did not recall any specific request from Maughn to perform Regulation 126 analysis and he never told Maughn that Inter-American had conducted Regulation 126 analysis.
Browne further testified that at yearend 1990, Inter-American had not updated the segregated asset portfolio listing to reflect transactions for 1990. When Browne discovered that the individuals responsible for completing the work had not updated the portfolio, he and Inter-American actuary Terrence Erickson resolved that they would estimate the investment returns that should be credited to ERAC under the agreements, based on their knowledge of the historic performance of the portfolio and their general historic knowledge of what transactions were likely to have occurred.
Browne stated that during "1989, 1990, or the first six months of 1991," no one from ERAC came in to inspect the records of Inter-American pertaining to the portfolio. Inter-American prepared quarterly reports and typically sent them to ERAC auditor Laura Fields. He stated that she would contact Inter-American if she observed errors or if she had questions about the reports. He further testified that Inter-American paid ERAC the quarterly amounts due for the reinsurance ERAC provided. Browne recalled having a 20minute phone conversation with Fields in approximately March 1990 informing her that estimates had been made.
In November 1991, Browne met with Laura Fields, James Maughn, and a reinsurance intermediary from Mystic Reinsurance in Inter-American's Chicago offices. At that meeting, they discussed the Department's investigation and Inter-American's "need to do cash flow scenario testing on the [ERAC] block of business, and at that meeting Mr. Maughn suggested that Mystic Reinsurance might be able to help us with that type of cash flow testing." Browne did not recall any complaints regarding the use of estimated figures during that meeting.
Peter Gallanis, a special deputy receiver for the Department, testified that when Inter-American went into liquidation, Inter-American had not paid all of its liabilities under its insurance policies. Gallanis further testified that Inter-American's nonpayment did not release ERAC from its reinsurance obligations.
Raymond Schlude, Jr., a consulting actuary, testified on behalf of the Liquidator. He was asked to assist the Liquidator in determining whether and how much ERAC owed Inter-American's estate for reinsurance. Schlude stated that in his investigation, he reviewed the asset portfolio as of December 31, 1988, but did not find a portfolio as of December 31, 1989. He also testified that Inter-American was specifically required by the SAPA to conduct Regulation 126 analysis. He further testified that based on the reports that he made, "Employers Re owes Inter-American 9.55 million on the date of liquidation."
ERAC moved for a directed finding after the direct examination of Browne and the full testimony of Gallanis and Schlude. That motion was denied. The following day, after the cross-examination of Rick Browne and the close of the Liquidator's case in chief, ERAC renewed its motion for directed finding. That motion was also denied.
ERAC accountant Laura Fields testified for ERAC that she conducted an audit of Inter-American in 1988. In March 1990, Fields received a fax from Inter-American *188 actuary Erickson that included the annual accounting for year-end 1989. There was a notation on that fax transmittal that indicated to Fields that the portfolio listing would follow. Months later, Fields called Inter-American to follow up on the portfolio listing that she had not yet received. At that time, no one at Inter-American informed her that Inter-American had stopped maintaining the portfolio. Fields testified that Browne never told her that Inter-American had stopped maintaining the portfolio. She stated that as an accountant, she did not have the authority to change any of the terms of the SAPA. Fields recalled that the year-end 1990 report from Inter-American reflected an unanticipated increase in the amount of surplus relief that ERAC granted them.
Fields further testified that she, James Maughn, and an ERAC internal audit employee met with Rick Browne in Chicago on November 5, 1991. She recalled that they discussed the asset listing and other concerns. Jim Knutson of Inter-American asked Fields to accompany him to his office to retrieve the listing. However, "he couldn't seem to place his hands on it," so she asked him to send it to her by mail. She never received it. During the first week of December 1991, Fields returned to Chicago for an unrelated audit and notified Inter-American that she would be by to pick up the listing. She recalled receiving a packet of information but later discovered that "[i]t was not what [she] asked for."
James Maughn, ERAC's chief actuary and senior executive, testified at trial that he had a telephone conversation with Rick Browne prior to the completion of the SAPA. In that conversation, "we agreed to try to work something out that would have some element of risk in it that would be deemed acceptable to them [the Department]." The agreement "was the maximum risk transfer which we found acceptable to enter into relative to Inter-American, and had the Department chosen not to approve it, that was okay with us." Maughn testified that per the agreement, Inter-American was not required to place the potential pledged assets in an escrow or trust. However, there would have been consequences if Inter-American chose to sell those pledged assets and purchased other assets once they had been placed in the asset portfolio. Maughn stated that while the agreement required that Regulation 126 testing be conducted at "calendar year-end," it would have been appropriate and accurate to conduct it quarterly. He stated that the agreement called for a "calendar year matching" but did not "necessarily require that they provide that to us."
Maughn recalled that there was an audit of Inter-American at the end of 1988 and the end of 1990. Maughn spoke to Rick Browne of Inter-American via telephone on October 31, 1991, regarding his desire to "review the actual investment results and return on the portfolio as well as see the actual assets in the segregated asset portfolio." He explained that ERAC was "trying to figure out the reserve correction and we need an explanation for that and whether it's appropriate and whether or not we want evidence that if there is an adjustment necessary to the portfolio that they have in fact been making it, as required by the agreement." During that telephone conversation with Browne, Maughn was not told that Inter-American was no longer maintaining the portfolio.
While in Chicago on other business in November 1991, Maughn stopped by the Inter-American offices. Maughn, Rick Browne and Jim Knutson participated in a meeting on November 5, 1991. Maughn recalled that during the meeting, "We discussed the requirements under our agreement *189 about maintaining the segregated asset portfolio, including the asset liability analysis, which it also requires, and in essence, we were told we would be given the portfolio, but we were also told that they had not been doing the analysis in accordance with the agreement at this time." He further testified that, "The point is I suppose we could have walked away. They weren't performing under the agreement, but we did acknowledge that with the portfolio, it would be possibleit would be possible with the portfolio to establish what the appropriate amounts of relief they should have been reporting was." He stated that at this November 5, 1991, meeting, Inter-American was still promising to provide the portfolio. He further testified, "In fact, they were still asking us for additional relief at this point. When we subsequently learned that they aren't maintaining the portfolio, it kind of becomes clear why they didn't tell us at this meeting." In a letter written on November 19, 1991, from Maughn to Browne, Maughn indicated that ERAC was still looking forward to getting the portfolio of assets as maintained over the years.
Maughn reviewed the packet of documents provided to Fields in December 1991 and he described it as "garbage" and "it in no way, shape or form is it close to the portfolio of assets and an indication of what had been invested and reinvested, sold, bought, balances." Maughn testified that this packet was the first indication that Inter-American was not maintaining the portfolio.
During trial, on June 12, 1998, ERAC moved to voluntarily dismiss, without prejudice, its amended cross-motion for declaratory relief. That motion was granted.
The Liquidator filed a motion for leave to file its third amended counterclaim on June 15, 1998. The Liquidator's third amended counterclaim alleged breach of contract and asserted that Inter-American had substantially performed all of its material obligations under the treaties as of the date of liquidation. In the alternative, the amendment alleged that the Liquidator and Inter-American substantially performed all of their material obligations under the SAPA "except insofar as they had been waived by ERAC expressly and by consistent course of performance." ERAC objected to the amendment. The court took the motion to amend under advisement.
In its May 23, 2000, ruling, the trial court granted the Liquidator leave to file its third amended complaint and found in favor of the Liquidator. Relative to the existence of consideration, the court held that "[c]ertainly ERAC knew that Inter-American had not performed the Regulation 126 testing" and ERAC "certainly benefitted from its relationship with Inter-American." Finally, based on the testimony of Raymond Schlude, an ERAC actuary, the court found that the Liquidator presented an adequate basis for the court to award damages.
On June 23, 2000, the Liquidator filed a motion for prejudgment interest on the court's award of $9,552,215. On August 25, 2000, the court granted the Liquidator's motion for prejudgment interest on the breach of contract claim award and ordered ERAC to pay a total of $11,137,177 million to the Liquidator.

ANALYSIS

I
The first issue is whether the SAPA provides coverage for the "Class C" claims presented to it after Inter-American's liquidation. For purposes of this appeal, Class C insureds generally involved living insureds with no claims at the time of Inter-American's insolvency. ERAC asserts *190 that the SAPA was an executory contract that the Liquidator did not assume and under which it has no postliquidation rights. ERAC asks that the lower court decision be reversed. The Liquidator responds that the contracts were not executory on the date of liquidation because Inter-American's material obligations with respect to reinsurance "thenowed" had all been performed.
The Liquidator also asserts that ERAC has waived its argument that ERAC had no contractual obligation to Class C policyholders. We agree. During a pretrial hearing on September 7, 1994, before the Honorable Edward C. Hofert, the following colloquy occurred:
"MR. SUNU [ERAC attorney]: When Inter-American went into liquidation in December of 1991, that policyholder knew exactly what the cash surrender value of his policy was. And we believe that that is the value that the policyholder claims should be.
It is set forth in the contract documents between Inter-American and the policyholder. We believe it is a fair
THE COURT: Is there anything in the policy itself which would enlighten us as to the expectations of the policyholder?
MR. SUNU: I think that's the cash surrender value.
* * *
MR. SUNU: Your honor, we as a reinsurer, we are not saying we don't have to pay these claims.

THE COURT: You are just saying that the amount should be less?

MR. SUNU: That's right. Because we believe that the formula that they are using is inflating the policyholder's claim value.
THE COURT: All right."
The court ruled as follows:
"THE COURT: All right. * * *
The court feels that the insurance companies and reinsurance companies have a duty to the policyholders.
To what extent that duty is, is dependent to the extent that, I suppose, it is measured by the damage which is afforded to that particular party.
* * *
And I believe the reinsurance company by virtue of taking the premiums accepts the risk, a risk that they could ameliorate by cautious audit and so forth.
Under the circumstances, I will approve the Liquidator's plan and overrule the objections. And will sign an order to that effect." (Emphasis added.)
In November 1995, during a hearing before Judge McBride on the parties' cross-motions for declaratory judgment, attorney William Snyder for Alabama Re stated to the court:
"MR. SNYDER: There was never any issue of this litigation as to whether policyholders who fell within example C, people who had survived and simply had policies in place, had some claim against the estate. The only issue is that to be valued." (Emphasis added.) Judge McBride ruled:
"THE COURT: * * * Having reviewed all of that, I'm going to grant the liquidator's request for declaratory relief, and I find that the contracts are not executory.
Although the liquidator asked for alternative relief, I'm finding today that the contracts are not executory.
I'll enter an order to that effect, and those obligations at the time, as of the *191 date of liquidation, are going to be recoverable.
So that is the order. It may be written up as such. And that is based upon the authority, and I find that the authority cited by the liquidator is more persuasive, and in particular, In re Sudbury. So that will be the order today."
Based on these colloquies, we hold that ERAC has waived its argument that the reinsurance contracts do not provide coverage for the Class C living insureds at the time of insolvency. Even if the argument were not waived, we would nonetheless hold that the contracts were not executory at the time of liquidation.
The construction of an insurance policy is a question of law subject to de novo review. American States Insurance Co. v. Koloms, 177 Ill.2d 473, 479-80, 227 Ill.Dec. 149, 687 N.E.2d 72 (1997). Although there is no precise definition of what contracts are executory, they are generally contracts on which performance remains due to some extent on both sides. In re Redo, 54 B.R. 871 (Bankr.N.D.Ill. 1985). The widely accepted definition provides that a contract is executory if the "obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance to the other." In re Liquidation of Inter-American Insurance Co. of Illinois, 303 Ill.App.3d 95, 97, 236 Ill.Dec. 490, 707 N.E.2d 617, citing V. Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L.Rev. 439, 460 (1973).
Section 194 of the Illinois Insurance Code (215 ILCS 5/194 (West 1994)) provides:
"The rights and liabilities of the company and of its creditors, [and] policyholders * * * shall be fixed as of the date of the entry of the Order directing liquidation or rehabilitation unless otherwise provided by Order of the Court." 215 ILCS 5/194 (West 1994).
Relative to the instant case, the trial court in deciding that the reinsurance contracts were not executory at the time of liquidation found In re Sudbury, 153 B.R. 776 (Bankr.N.D.Ohio 1993), instructive. In Sudbury, the bankruptcy debtor requested a declaration that its insurance policies and related premium agreements were not executory contracts. Sudbury, 153 B.R. at 776. In that case, the insurers adjusted, administered, and paid claims arising from occurrences that took place during the policy period. Sudbury, 153 B.R. at 777. The court ruled that the insurance polices of the insolvent company were not executory contracts. Sudbury, 153 B.R. at 778. The Sudbury court reasoned that "denying executory contract status to the Policies would not impair the Insurer's rights or remedies. * * * Therefore, not treating the Policy as an executory contract will not affect the [i]nsurers." Sudbury, 153 B.R. at 780.
In our view, when Inter-American became insolvent, its failure to maintain the portfolio did not excuse ERAC's performance. Inter-American paid premiums to ERAC and ERAC accepted those payments. ERAC's duty, in turn, was to provide reinsurance. Because the contracts were not executory, ERAC was still obligated under them. Importantly, in the instant case, based upon a formula that has been recognized and accepted for determining the value of policies when the policyholders are alive when an insolvency occurs, the parties stipulated that the policies at issue had a net value of $9.55 million. In our view, the trial court did not err in finding that the reinsurance agreement obligated ERAC to pay the Class C insureds the net present value of *192 their policies at the time of Inter-American's liquidation.

II
ERAC also contends that the trial court erred when it denied its motion for directed finding. The Liquidator responds that ERAC waived its right to appeal that denial when it introduced its own evidence and did not renew the motion at the close of its case in chief. Generally, where a defendant elects to present evidence following the denial of his motion for a directed finding, any error in the trial court's ruling on the motion is waived unless the defendant renews the motion at the close of all the evidence. People v. Clark, 221 Ill.App.3d 303, 310, 163 Ill.Dec. 568, 581 N.E.2d 722 (1991); People v. Wilson, 143 Ill.2d 236, 245,157 Ill.Dec. 473, 572 N.E.2d 937 (1991). The record reveals that ERAC's motion was not renewed at the close of all the evidence. Therefore, ERAC's contention has been waived.
Even if ERAC's argument had not been waived, we hold that the trial court's decision to deny ERAC's motion for a directed verdict was not against the manifest weight of the evidence. See Denis F. McKenna Co. v. Smith, 302 Ill.App.3d 28, 31, 235 Ill.Dec. 253, 704 N.E.2d 826 (1998). In support of its motion for directed verdict, ERAC argued that the Liquidator had not met its burden of proving that Inter-American met all of the material obligations of the contract. The Liquidator responded that ERAC acquiesced to Inter-American's noncompliance and ERAC would gain an unfair advantage by being allowed to walk away from the contract after the acquiescence.
To meet the burden in a breach of contract action, the plaintiff must establish an offer and acceptance, consideration, definite and certain terms of the contract, plaintiffs performance of all required contractual conditions, the defendant's breach of the terms of the contract, and damages resulting from the breach. Mannion v. Stallings & Co., 204 Ill.App.3d 179, 186, 149 Ill.Dec. 438, 561 N.E.2d 1134 (1990). At the time of ERAC's first motion for directed verdict, Rick Browne of Inter-American, actuary Raymond Schlude, and special deputy Gallanis all testified for the Liquidator. Their testimony provided information as to the offer, the acceptance, the terms of the contract, Inter-American's fulfillment of the material terms of the contract by paying premiums to ERAC, the fact that ERAC refused to pay to Class C policyholders, and the damages ERAC still owed to the Inter-American estate.

III
At trial, ERAC argued that the Liquidator's third motion to amend was untimely and changed the theory of the entire case. On appeal, ERAC maintains that the trial court erred in allowing the Liquidator to amend his counterclaim. The Liquidator responds that ERAC was not prejudiced by the amendment.
In Illinois, courts are encouraged to freely and liberally allow the amendment of pleadings. Barille v. Sears Roebuck & Co., 289 Ill.App.3d 171,179, 224 Ill.Dec. 557, 682 N.E.2d 118 (1997). The circuit court has broad discretion in ruling upon motions to amend pleadings, and its ruling will not be disturbed absent an abuse of discretion. Barille, 289 Ill. App.3d at 179, 224 Ill.Dec. 557, 682 N.E.2d 118. To determine whether the circuit court abused its discretion, four factors are considered: (1) whether the proposed amendment is timely; (2) whether previous opportunities to amend the pleading can be identified; (3) whether other parties will sustain prejudice or surprise by virtue of the proposed amendment; and
*193 (4) whether the proposed amendment will cure the defective pleading. Barille, 289 Ill.App.3d at 179, 224 Ill.Dec. 557, 682 N.E.2d 118.
Amendments ordinarily will not be permitted after trial has begun if the proposed amendment raises matters of which the pleader had full knowledge at the time of interposing the original pleading and there is no excuse for failing to raise those matters in the original pleading. Bank of Chicago v. Park National Bank, 266 Ill.App.3d 890, 904, 203 Ill.Dec. 915, 640 N.E.2d 1288 (1994). A trial court has broad discretion to allow the addition of new defenses on just and reasonable terms at any time before final judgment so long as other parties do not thereby sustain undue prejudice or surprise. See 735 ILCS 5/2-616 (West 1994).
In our view, the trial court did not abuse its discretion in allowing the Liquidator to file its third amended complaint. The record shows that the Liquidator's answer to counts II through VI of ERAC's amended cross-motion for declaratory relief and counterclaim included the affirmative defense of waiver. Moreover, in light of the fact that at the time of the filing of the third amended complaint, ERAC sought dismissal of its counterclaims, it stands to reason that the Liquidator wished to preserve its affirmative defense absent those counterclaims.

IV
ERAC's final contention is that the trial court erred in holding that the Liquidator established the waiver of strict compliance with the terms of the contract. We hold that the court did not err in finding that ERAC waived strict compliance. Parties to a contract have the power to waive provisions placed in the contract for their benefit and such a waiver may be established by conduct indicating that strict compliance with the contractual provisions will not be required. Whalen v. K Mart Corp., 166 Ill.App.3d 339, 343, 116 Ill.Dec. 776, 519 N.E.2d 991 (1988). An implied waiver of a legal right may arise when conduct of the person against whom waiver is asserted is inconsistent with any other intention than to waive it. Whalen, 166 Ill.App.3d at 343, 116 Ill.Dec. 776, 519 N.E.2d 991. Whether there was in fact a waiver of contractual provisions depends upon the intent of the nonbreaching party. Whalen, 166 Ill.App.3d at 343, 116 Ill.Dec. 776, 519 N.E.2d 991. If a party has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, the party has waived it and may not thereafter seek judicial enforcement. Whalen, 166 Ill. App.3d at 343, 116 Ill.Dec. 776, 519 N.E.2d 991. Whether waiver has occurred is a question of fact when the material facts are in dispute or where reasonable minds might differ in the inferences to be drawn from undisputed facts. Melrose Park National Bank v. Carr, 249 Ill.App.3d 9, 16, 188 Ill.Dec. 269, 618 N.E.2d 839 (1993).
The trial court in the instant case outlined the indications and implications of ERAC's conduct. The court wrote in its final order:
"Certainly ERAC knew that Inter-American had not performed the Regulation 126 testing as set forth in the SAPA yet ERAC continued to receive payments from Inter-American. If the testing was a material breach, it was waived by ERAC's conduct. ERAC did not demand the testing and therefore cannot now be heard to complain."
Further the court wrote, "Here ERAC certainly benefitted from its relationship with Inter-American. It is uncontested that ERAC received a fee for its services although my notes do not reflect the amount. I find that we do have consideration." *194 It is our view that ERAC accepted reinsurance premium payments from Inter-American over an extended period without complaining of or objecting to Inter-American's method of portfolio maintenance. Therefore, ERAC waived strict compliance with the Inter-American's portfolio maintenance.
For the foregoing reasons, we affirm the holding of the trial court.
Affirmed.
TULLY and McNULTY, JJ., concur.